UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PLANNED PARENTHOOD OF INDIANA AND KENTUCKY, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:17-cv-01636-SEB-DKL |
| COMMISSIONER, INDIANA STATE DEPARTMENT OF HEALTH, in his official capacity, *et al.*, | ) ) ) ) ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S
## MOTION FOR PRELIMINARY INJUNCTION

Kenneth J. Falk
Gavin M. Rose
Jan P. Mensz
ACLU of Indiana
1031 E. Washington St.
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
grose@acu-in.org
jmensz@aclu-in.org

*Attorneys for Plaintiff*

Jennifer Dalven
Motion to Appear *Pro Hac Vice* to be filed
Andrew Beck
Motion to Appear *Pro Hac Vice* pending
American Civil Liberties Union
New York, NY 10004
212/549-2641
jdalven@aclu.org
abeck@aclu.org

Jennifer Sandman
Melissa Cohen
Motions to Appear *Pro Hac Vice* to be filed
Planned Parenthood Federation of America
123 William St.
New York, NY 10038
212/261-4584
jennifer.sandman@ppfa.org
melissa.cohen@ppfa.org

# TABLE OF CONTENTS

Introduction……………………………………………………………………..   1

Relevant Statutory and Regulatory Law………………………………………...   2

Statement of Facts…………………………………………………………………..   5

Argument……………………………………………………………………………..   11

    I.    PPINK will prevail on the merits of its claims……………………....   11

        A. Because the parental consent law now provides that a juvenile court may order the minor's parents to be informed that the minor is present and seeking an abortion, this statute is unconstitutional……………………………………………………   12

            1.    The Supreme Court has established that a woman has the absolute right to obtain an abortion prior to fetal viability and that any regulation of this right is subject to undue-burden analysis…………………………………..   12

            2.    The Supreme Court has held that allowing a parent to block a minor from obtaining an abortion is unconstitutional absent a bypass procedure……………….   13

            3.    *Bellotti* requires that a mature minor be able to obtain an abortion without parental involvement and Indiana Code § 16-34-2-4 (eff. July 1, 2017), which allows for parental involvement through notice, even if the minor is found to be mature, is unconstitutional………………....   14

            4.    Regardless of *Bellotti*, Indiana Code § 16-34-2-4 (eff. July 1, 2017) is unconstitutional as it imposes an undue burden on minors…………………………….......................   19

        B. The identification and affidavit requirements imposed on physicians are also unconstitutional...........................................   21

            1.    Indiana Code § 16-34-2-4(a)(3) and Indiana Code § 16-34-3-4(k)(2), which generally require PPINK's physicians to obtain from consenting parents unspecified documentations that a "reasonable" or a "reasonably prudent" person would rely upon to establish the parent's identity, are unconstitutionally vague…………...   21

i

          a. Introduction to vagueness doctrine…………………........     21

          b. The statutes are vague…………………………………..     23

      2.    Indiana Code § 16-34-2-4(a)(3) and Indiana Code § 16-34-3-4(k)(2), which require PPINK's physicians—rather than other health center staff—to obtain identifying documentation from consenting parents and to execute an affidavit indicating that a "reasonable person under similar circumstances would rely on" that documentation "as sufficient evidence of identity and relationship," but do not impose similar requirements on physicians performing any other medical procedure, violate equal protection………………………………………….     26

          a. Background to equal protection analysis…………………     27

          b. The statutes violate equal protection………………………     29

   C.    To the extent Indiana Code § 16-32-2-4.2 prevents PPINK from advising patients of legal options for obtaining abortion services it violates the First Amendment…………….     31

      1.    PPINK's provision of out-of-state referrals and other information related to Indiana's consent requirement is pure speech protected by the First Amendment………….     31

      2.    Indiana Code § 16-34-2-4.2(c)'s consent-based restriction on PPINK's speech fails strict scrutiny and is unconstitutional…………………………………………....     32

II.    The other requirements for a preliminary injunction are met here………………………………………………………………     34

Conclusion……………………………………………………………………     35

Certificate of Service……………………………………………………….     36

**Introduction**

Senate Enrolled Act No. 404 amends Indiana law to impose new, and unconstitutional, conditions and restrictions concerning the provision of abortions to unemancipated minors. Absent action by this Court, effective July 1, no longer will Indiana provide minors the constitutionally-mandated option of seeking a judicial bypass or waiver of the state's parental consent requirement without threat that the state will order notification of their parents. Rather, the Act requires that a minor's parent be notified of her pregnancy and intention to seek an abortion even if the court finds that the minor is entitled to a waiver of the parental consent requirement because she is sufficiently mature to make the decision independent of her parents, unless the bypass court makes a second finding that notification would be contrary to her best interests. The Act also allows for notice even if the bypass is denied and allows for notice to be ordered even before the court rules on the waiver request. The new law makes Indiana an outlier among states. More significantly, it creates enormous obstacles to young women who have legitimate reasons to keep their abortion decision, or their unsuccessful attempt to obtain a bypass, confidential. This violates the due process rights of the minors.

Moreover, the Enrolled Act imposes new—and unique—requirements upon physicians performing abortions. They now must execute an affidavit when parental consent is provided for the abortion, after obtaining identification and other evidence from the unemancipated minor and her parent, certifying that "to the best information and belief, a reasonable person under similar circumstances would rely on the information provided . . . as sufficient evidence of [the] identity and relationship" between the young woman and the consenting parent. This is an unclear standard and violation of its requirements subjects the physicians to criminal liability and the physicians and provider to licensing actions. It violates both due process and equal protection.

The constitutional harm caused by the Enrolled Act is amplified by the fact that the law creates a cause of action against persons who aid or assist unemancipated minors seeking abortions from obtaining them without satisfying the amended consent or parental waiver of consent procedures noted above. What this means for Planned Parenthood of Indiana and Kentucky, Inc. ("PPINK") is that it and its employees are liable if they continue their general practice of advising patients and those seeking PPINK's services of the availability of less restrictive abortion options in other states. PPINK and its employees will be compelled to be silent about these other options. This violates the First Amendment.

A preliminary injunction should issue against all the defendants, with the exception of the Judge of the Marion Superior Court, Juvenile Division.[1]

**Relevant statutory and regulatory law**

Indiana Code § 16-34-2-1.1(a) provides that an abortion cannot "be performed except with the voluntary and informed consent of the pregnant woman upon whom the abortion is to be performed." If the young woman seeking an abortion is an unemancipated minor, current law provides that the physician must obtain the written consent of one of the minor's parents or legal guardians. Ind. Code § 16-34-2-4(a) (amended July 1, 2017). However, current Indiana law contains a constitutionally-mandated "judicial bypass" procedure that allows the minor to obtain an abortion without the consent or knowledge of a parent or guardian if she brings a petition in the juvenile court located in the county where she resides or where the abortion is to be performed and demonstrates either that she is mature enough to make the abortion decision independently or that the abortion would be in her best interests. Ind. Code § 16-34-2-4 (b), (d) (amended July 1, 2017). The decision on the bypass must be made within 48 hours after the

---

[1]     Federal law, 42 U.S.C. § 1983, provides that a judicial officer cannot be sued for injunctive relief, "unless a declaratory decree was violated or declaratory relief was unavailable." Therefore, the sole relief sought against the Judge of the Marion Superior Court, Juvenile Division, is declaratory relief.

petition is filed. Ind. Code § 16-34-2-4(e).

The Enrolled Act significantly alters the bypass process. An unemancipated minor may still seek a judicial bypass from a juvenile court, and the court still must waive the requirement of parental consent if she demonstrates that she is sufficiently mature to make the abortion decision independently or that it is in her best interests to obtain the abortion. Ind. Code § 16-34-2-4 (b), (d) (eff. July 1, 2017). However, the amended law provides that the parent, legal guardian, or custodian (hereinafter "parent") of the minor must be informed that she is pregnant and desires an abortion "unless the juvenile court finds that it is in the best interests of an emancipated pregnant minor to obtain an abortion without parental notification following a [bypass] hearing." Ind. Code § 16-34-2-4(d) (eff. July 1, 2017). Absent such a best interests finding by the juvenile court, notice to the parent must be provided, Ind. Code § 16-34-2-4(e) (eff. July 1, 2017), even if the court has found the minor sufficient mature to make the abortion decision independently. Moreover, there is nothing in the amended statute that indicates that notice may be ordered only if the bypass is granted and the juvenile court may therefore order notice if the bypass is denied or may order it before a bypass decision is made.[2]

New requirements have also been imposed if the parent consents to the minor's abortion. Indiana law presently requires a consenting parent to evidence that consent in writing, Ind. Code § 16-34-2-4(a), and, as set forth below, PPINK also requires that the parent present identification. However, as of July 1st, the physician performing the abortion must also obtain

---

[2]     The amended statute provides in relevant part that:

The juvenile court shall waive the requirement of parental notification under subsection (d) if the court finds that obtaining an abortion without parental notification is in the best interest of the unemancipated pregnant minor. If the juvenile court does not find that obtaining an abortion without parental notification is in the best interest of the unemancipated minor, the court shall, subject to an appeal under subsection (g), order the attorney representing the unemancipated minor to service the notice required under subsection (d).

Ind. Code § 16-34-2-4(e) (eff. July 1, 2017).

[3]

government-issued proof of identification from the parent and "some evidence, which may include identification or other written documentation, that provides an articulable basis for a reasonably prudent person to believe that the person is the parent." Ind. Code § 16-34-2-4(a)(2), (3) (eff. July 1, 2017). Nowhere in the statute is the notion of "written documentation that provides an articulable basis for a reasonably prudent person to believe that the person is the parent" defined or explained in any way. The Enrolled Act further provides that the physician who receives parental consent must execute an affidavit that contains a

> [c]ertification that, to the physician's best information and belief, a reasonable person under similar circumstances would rely on the information provided by the unemancipated pregnant minor and the unemancipated pregnant minor's parent or legal guardian or custodian as sufficient evidence of identity and relationship.

Ind. Code § 16-34-2-4(k)(2) (eff. July 1, 2017). This language is likewise not defined or explained in any way. The affidavit must be included in the minor's medical record. *Id.*

Finally, the Enrolled Act penalizes persons who knowingly aid or assist unemancipated minors "in obtaining an abortion without the consent required" by Indiana law, Ind. Code § 16-34-2-4.2(c) (eff. July 1, 2017)—such as, for instance, by assisting a minor in obtaining an abortion out of state. A person who does this, and who is not the minor's parent, stepparent, grandparent, step grandparent, sibling, or stepsibling, is liable for damages, including punitive damages, attorney's fees, and court costs, Ind. Code § 16-34-2-4.2(d) (eff. July 1, 2017), in addition to the penalties on abortion providers, staff, and health centers set forth below.

There are other statutes and regulations that can impose penalties on abortion providers or its employees who violate portions of the new Enrolled Act. A PPINK physician who performs an abortion intentionally or knowingly in violation of the law pertaining to the consent for a minor to have an abortion or the bypass procedure available to avoid parental consent and notice commits a Class A misdemeanor. Ind. Code § 16-34-2-7(b). Moreover, a physician with

[4]

an Indiana license who commits a crime that has a direct bearing on the physician's ability to practice competently or is harmful to the public or who knowingly violates any state law or rule regulating the medical profession is subject to discipline from the Indiana Medical Licensing Board. Ind. Code § 25-1-9-4(a)(2), (3).

PPINK's abortion facilities are licensed by the Indiana State Department of Health pursuant to 410 IAC 26-2-1. The license can be revoked, or other discipline imposed, for any number of reasons including "permitting, aiding, or abetting the commission of any illegal act in an abortion clinic," 410 IAC 26-2-8(b)(1), (2) or failing to have authorized individuals make entries in medical records, 410 IAC 26-7-2(b)(3).

**Statement of Facts**[3]

*Background to PPINK*

PPINK is an Indiana not-for-profit corporation that operates numerous health centers in Indiana where thousands of women, men, and teens receive reproductive health services and comprehensive sexuality education. (Decl. of Forest Beeley ["Beeley"] ¶ 3, attached as Exhibit 1). PPINK operates three Indiana health centers, in Bloomington, Indianapolis, and Merrillville, which offer both surgical abortion services and abortions using medication alone. (*Id.* ¶ 4). A fourth health center, located in Lafayette, provides only medication abortions. (*Id.* ¶ 5). At PPINK surgical abortions are available through the first trimester of pregnancy, 13 weeks and 6 days after the first day of a woman's last menstrual period, and a medication abortion is available through 70 days after a woman's last menstrual period. (*Id.* ¶ 6).

*Abortions provided with parental consent - effects of the new verification requirements*

---

[3]    It is believed that the following facts will be presented to support PPINK's request for a preliminary injunction. Inasmuch as discovery has yet to be completed in this case, PPINK reserves the right to include additional facts in future filings or arguments.

PPINK provides abortions to minors. (*Id.* ¶ 8). PPINK is aware, both from national statistics and from its own experience, that the large majority of minors who obtain abortions do involve their parents in the decision. (*Id.* ¶ 9). Therefore, most abortions performed on minors by PPINK are done with parental consent. (*Id.*).

Indiana law requires that a woman desiring to obtain an abortion must receive in person certain state-mandated information at least 18 hours prior to the abortion. Ind. Code § 16-34-2-1.1(a)(1). At this initial visit, in addition to receiving the mandated information, the PPINK patient will also sign all necessary paperwork, including the consent for the abortion and all other required documents (Beeley ¶ 10). If the patient is a minor, and her parent consents to the abortion, it is at this initial visit where the parent signs the consents and other papers along with the minor. (*Id.* ¶ 12). The parent will have to present identification and the minor will as well, preferably a photo ID. (*Id.* ¶ 13). All that the parent will have to present is a photo ID as at the current time PPINK does not requires any further forms of identification or documentation. (*Id.* ¶ 14). Identification and all initial paperwork is handled by non-physician PPINK staff, as the physicians do not usually see the patient until the date of the abortion and will frequently not even be present at the health center during this initial visit. (*Id.* ¶¶ 10, 15).

The Enrolled Act imposes on PPINK's physicians the duty to obtain not only government-issued identification for the consenting parent, but also some evidence "that provides an articulable basis for a reasonable prudent person to believe that the person is the parent." Ind. Code § 16-34-2-4(a) (eff. July 1, 2017). And, the physicians must sign an affidavit to that effect. However, not only are PPINK's physicians not directly involved in obtaining and reviewing identifications, but it is simply not clear what the standard—"some evidence . . . that provides an articulable basis for a reasonable prudent person to believe that the person is the

parent"—means. (Beeley ¶¶ 16-17; Decl. of Dr. Carol Dellinger ("Dellinger") ¶¶ 8-10, attached as Exhibit 2). And, given the serious consequences that may occur to the physicians if a prosecutor or Medical Licensing Board believe that this requirement has been violated, PPINK anticipates that its physicians will now have to take time to review the identification presented and perhaps even question the unemancipated minor and accompanying adult to attempt to determine if sufficient evidence has been produced as required by the statute. (Beeley ¶ 18). There is no similar requirement imposed on Indiana physicians performing any other procedure or under any other circumstances. (Dellinger ¶¶ 11-13).

*Abortions provided after a judicial bypass and the effect of the new notice provision*

Although the large majority of minor abortions that PPINK performs occur with the consent of the parent, PPINK also performs abortions where the minor does not have parental consent and has obtained a judicial bypass pursuant to Indiana law. (Beeley ¶ 19). When a minor indicates to PPINK that she is considering an abortion, PPINK will counsel her to discuss this matter with a parent and, if the minor still indicates that she wishes to obtain the abortion, PPINK will again counsel her to try to obtain parental consent. (*Id.* ¶ 20). However, at times the minor will inform PPINK staff that she does not want to or feels she cannot inform her parent that she is pregnant and that she wishes to obtain an abortion. (*Id.* ¶ 21).

In this scenario, the minor will be told that there is a woman who acts as a "bypass coordinator," who does not work for PPINK but who maintains a list of attorneys who can discuss with the minor the option of seeking a bypass of the consent requirement in juvenile court and, if she so elects, represent her in such a proceeding. (*Id.* ¶ 24). The minor will be given the phone number of the bypass coordinator. (*Id.*; Decl. of Kathryn Smith ["Smith"] ¶ 6, attached as Exhibit 3). The bypass coordinator, who is not an attorney, monitors a floating pool of Marion

[7]

County attorneys who represent the minors in bypass cases, most of which are filed in the Marion Superior Court, Juvenile Division. (Smith ¶¶ 2, 4-5). The efforts of the bypass coordinator are not sponsored in any way by PPINK, and occasionally the bypass coordinator will be contacted by a young woman who is seeking an abortion from a provider other than PPINK. (*Id.* ¶ 6). Since October 2011 the bypass coordinator has been contacted by approximately 60 minors who had expressed an interest in obtaining an abortion without parental consent. (*Id.* ¶ 9). Most of them were 17 years of age. (*Id.*). Not all of these young women proceeded to go through the bypass process to obtain an Indiana abortion. (*Id.*).

The bypass coordinator will frequently speak to the young women for some time, although on occasion the minor will just want basic information and the call will be briefer. (*Id.* ¶ 10). During the conversation the bypass coordinator will outline for the young women, to the best of her ability, the process of obtaining a judicial bypass and what must be demonstrated in court. (*Id.* ¶ 11). This information is repeated by the attorneys to whom the young women are referred, if they are interested in moving forward with the bypass. (Decl. of Jane Glynn ["Glynn"] ¶ 14; Decl. of Katherine Flood ["Flood"] ¶ 10, attached as Exhibits 4 and 5). When speaking to the young women the bypass coordinator attempts to ascertain that they are certain about the decision and that no one is forcing them to obtain an abortion. (Smith ¶ 12).

Generally, the young women have not told their parents that they are pregnant and desire to seek an abortion. (*Id.* ¶ 14). The young women indicate to PPINK and the bypass coordinator numerous reasons why they have not told their parents about their pregnancy and desire to seek an abortion. (*Id.* ¶¶ 14-15; Beeley ¶¶ 22-23). These include: a fear of being kicked out of the home, a fear of being abused or punished in some way, and a fear that the parent will attempt to block the abortion. (Smith ¶¶ 15-16; Beeley ¶ 22; Flood ¶ 9; Decl. of Suzanne M. Pinto ["Pinto"]

[8]

¶¶ 14–15, 19, attached as Exhibit 6; Decl. of Rita Lucido ["Lucido"] ¶¶ 8-12, attached as Exhibit 7).[4] Some minors simply do not know where their parents are, but do not have a legal guardian or custodian who can alternately fulfill the consent requirement. (Beeley ¶ 23; Lucido ¶ 13). Whatever the reason, the young women consistently express fear that their parent or parents will find out they are pregnant and seeking an abortion. (Smith ¶ 18; Glynn ¶ 12; Lucido ¶¶ 8-13). The Indiana experience in this regard is not unique: as noted by Dr. Suzanne M. Pinto, a clinical psychologist with more than three decades' worth of experience working with abused minors and parents who abuse their children, many young women face physical or emotional abuse if it is learned that they are pregnant and seeking an abortion. (Pinto ¶¶ 14-15, 19, 28).

The bypasses that are granted to PPINK's patients generally specify that the minor is mature enough to receive an abortion independent of her parents. (Beeley ¶ 26; Flood ¶ 6; Glynn ¶ 9). This is not surprising as the young women must have the ability to navigate the judicial bypass process, which is daunting and intimidating. (Smith ¶ 19; Lucido ¶¶ 15-16)). She must speak to the bypass coordinator—a perfect stranger—about extremely intimate matters and then discuss the same thing with a lawyer and then a judge. (Smith ¶ 19; Lucido ¶ 18.). She must organize her life so she can meet with the attorney and attend court without arousing parental suspicion. (Smith ¶ 19; Lucido ¶ 16.). And she must convince a judge that she should be able to obtain an abortion without parental consent. (Smith ¶ 19; Lucido ¶ 18.). As Dr. Pinto explains, for abused minors who fear reprisal if their abusive parent even so much as finds out that they are pregnant and seeking an abortion, this can be an extremely harrowing experience. (Pinto ¶¶ 19-26). Many abused minors will find it extremely difficult to make the full disclosure required

---

[4]        On least one occasion the mother of a young woman seeking a bypass discovered, through a third party, what her daughter was planning and blocked the minor's ability to have an abortion and forced her to give birth. (Glynn ¶ 13; *see also* Pinto ¶ 29).

to convince the judge—an imposing stranger, in an adversarial setting—that their abuser should not be notified. (*Id.* ¶¶ 20-26). And those who are able to disclose their abuse may be re-traumatized by being forced to relive the abuse, and the shame, guilt and fear arising from it, in court. (*Id.* ¶ 20; *see also* Lucido ¶ 18).

At least at the current time the bypass coordinator is able to assure young women that no one involved in the bypass process will tell their parents that she is pregnant or seeking a bypass, and this is a great relief to the young women. (Smith, ¶ 18; *see also* Pinto ¶18; Lucido ¶ 20). However, under the Enrolled Act, the young women will have to be told that it is possible that, even if they are granted a judicial bypass, their parents will discover they are pregnant and are attempting to obtain an abortion. (Smith ¶ 20; Glynn ¶ 16; Flood ¶ 12; Lucido ¶ 21). The possibility that this may occur will lead to many, if not all, of the young women abandoning their efforts to obtain an abortion (Smith ¶ 20; Flood ¶¶ 13-14; Glynn ¶ 17), and may force them to resort instead to drastic and potentially dangerous alternatives, including self-inducing a miscarriage, running away from home, committing suicide or continuing the pregnancy and having a child they do not want (Pinto ¶¶ 19, 28, 30; Lucido ¶ 22-23).[5]

*PPINK's referral practices and the effect of the Enrolled Act*

PPINK is regularly contacted by women, including minors, for abortion services and subsequently discovers, either during the initial phone contact or during the visit to one of its health centers, that it is unable to perform the abortion or that the minor might prefer to obtain an

---

[5]     The new notice requirement can also cause additional delay, as minors may delay seeking a bypass due to fear of notification, or they may need to seek an appeal if the bypass court finds a minor to be mature, but does not find that notification would not be in the minor's best interests. Minors often do not seek a bypass until they are nearing the end of their first trimester (Lucido ¶ 17), and additional delay can mean they will be past the point in pregnancy when they can obtain a medication abortion, or obtain an abortion in Indiana at all. (*Id.* ¶ 24). Other minors may experience grave consequences when, after a bypass is granted on grounds of maturity, a parent is nevertheless notified of their abortion decision, as required by the Act; these consequences may include loss of her home or psychological or physical abuse, as well as de facto veto of her abortion decision. (Smith ¶¶ 15-16; Beeley ¶ 22; Flood ¶ 9; Pinto ¶¶ 14–15, 19, Lucido. ¶¶ 8-12).

abortion elsewhere. This might be because the woman's pregnancy is past the first trimester (the date to which abortions are available in Indiana), or because there are other reasons why it would be desirable or necessary for the women to obtain an abortion in another state. (Beeley ¶ 27). In such a case, PPINK will frequently inform women, including minors, that they have the option to receive abortion services in states other than Indiana. (*Id.* ¶ 28). For example, PPINK and its staff are aware that in neighboring states—Illinois, Michigan, Ohio, and Kentucky—there are abortion providers who offer abortion services into the second trimester. (*Id.* ¶ 29). PPINK will inform those seeking abortion services of the availability of those services in other states. (*Id.*).

PPINK believes that the new judicial bypass procedure that provides that notice to the parents may be ordered, even if the juvenile court finds that the minor is found to be mature enough to make the abortion decision, or even if the bypass is denied, is more onerous than the comparable requirements in Indiana's neighboring states. (*Id.* ¶ 30). The same is true of the new identification requirements imposed on a minor and her parent. (*Id.* ¶ 31). Because of these rigorous requirements, PPINK would like to be able to inform unemancipated minors who seek abortion services after July 1st not only of the requirements of Indiana law but also that other states have less burdensome requirements. (*Id.* ¶ 32). However, under the Act doing so would subject PPINK and its staff to both civil liability and licensing sanctions. (*Id.* ¶ 33).

**Argument**[6]

## I.     PPINK will prevail on the merits of its claims

---

[6]     In order to determine whether a preliminary injunction should be granted, the Court weighs several factors: (1) whether the plaintiff has established a prima facie case, thus demonstrating at least a reasonable likelihood of success at trial; (2) whether the plaintiff's remedies at law are inadequate, thus causing irreparable harm pending the resolution of the substantive action if the injunction does not issue; (3) whether the threatened injury to the plaintiff outweighs the threatened harm the grant of the injunction may inflict on the defendant; and (4) whether, by the grant of the preliminary injunction, the public interest would be disserved. *See, e.g.*, *Baja Contractors, Inc. v. City of Chicago*, 830 F.2d 667, 675 (7th Cir. 1987). The heart of this test, however, is "a comparison of the likelihood, and the gravity of two types of error: erroneously granting a preliminary injunction, and erroneously denying it." *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 590 (7th Cir. 1984).

**A.**   **Because the parental consent law now provides that a juvenile court may order the minor's parents to be informed that the minor is pregnant and seeking an abortion, the statute is unconstitutional**

**1.**   **The Supreme Court has established that a woman has the absolute right to obtain an abortion prior to fetal viability and that any regulation of this right is subject to undue-burden analysis**

In *Roe v. Wade,* 410 U.S. 113 (1973), the Court held for the first time that the right to privacy implicit in the Constitution "is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." *Id.* at 153. In *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833 (1992) (plurality), a plurality of the United States Supreme Court, although rejecting the rigid trimester framework constructed by *Roe, id.* at 876, held that "a woman's right to terminate her pregnancy before viability is the most central principle of *Roe v. Wade.* It is a rule of law and a component of liberty we cannot renounce," *Id.* at 871.[7] The Court, however, recognized that the State has an important interest in protecting potential human life and that, in furtherance of this interest, it may regulate the right to an abortion as long as the regulation does not "impose[ ] an undue burden on a woman's ability to make this decision." *Id.* at 874.[8] If an undue burden is present the state regulation is unconstitutional as "reach[ing] into the heart of the liberty protected by the Due Process Clause." *Id.* The notion of "undue burden" is shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 877. The Court has stressed that the determination of whether a regulation poses an undue burden requires a court to balance

---

[7]   The Supreme Court has defined "viability" as the time "when, in the judgment of the attending physician on the particular facts of the case before him, there is a reasonable likelihood of the fetus' sustained survival outside the womb, with or without artificial support." *Colautti v. Franklin*, 439 U.S. 379, 388 (1979). Indiana law conforms to this definition. Ind. Code § 16-18-2-365.

[8]   "The three-Justice lead opinion in *Casey* is in some parts the opinion of the Court and in some the limiting concurrence. Although the undue burden test was endorsed by only three justices, as the narrowest ground for the Court's holding it is as binding on the lower courts as would be a majority opinion." *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 921 n. 11 (9th Cir. 2004) (citing *Marks v. United States*, 430 U.S. 188, 193 (1977)).

"the burdens a law imposes on abortion access together with the benefits those laws confer." *Whole Woman's Health v. Hellerstedt*, --U.S.--, 136 S.Ct. 2292, 2309 (2016).

> **2.    The Supreme Court has held that allowing a parent to block a minor from obtaining an abortion is unconstitutional absent a bypass procedure**

These constitutional norms extend to minors as well. In *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52 (1976), *overruled on other grounds by Casey*, the Supreme Court struck down a statute that required written consent of a parent or person acting in loco parentis before a minor could obtain an abortion. *Id.* at 72.[9] The Court recognized that "[c]onstitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors as well as adults are protected by the Constitution and possess constitutional rights." *Id.* at 74. Thus, despite the State's general interest in regulating the activities of minors, the Constitution does not afford parents the absolute right to veto a minor's abortion decision, "regardless of age or maturity." *Id.* at 75.

The Court expanded upon this holding in *Bellotti v. Baird*, 443 U.S. 622 (1979) (plurality), in which it reaffirmed the ability of a state to protect minors and to foster parental involvement in decisions that a minor may make. *Id.* at 634-39. However, the Court reasoned that the "unique nature and consequences of the abortion decision"—including the prospect of "unwanted motherhood"—makes it inappropriate to give a parent veto power over the minor's decision. *Id.* at 642-43. The Court further recognized that some minors will be mature enough to make the abortion decision independently, and "the peculiar nature" of this decision "requires the opportunity for case-by-case evaluations of the maturity of pregnant minors." *Id.* at 643 n.23.

---

[9]    The plurality in *Casey* overruled *Danforth* "to the extent that we permit a State to further its legitimate goal of protecting the life of the unborn by enacting legislation aimed at ensuring a decision that is mature and informed, even when in so doing the State expresses a preference for childbirth over abortion" *Casey*, 505 U.S. at 883.

The Court therefore held that if a state requires parental consent for abortion, there must be an escape valve: the law must establish a judicial bypass process through which a minor who is either mature enough to make the abortion decision independent of her parents, or for whom an abortion is in her best interest, can obtain the care she seeks. *Id.* at 643-44. In addition, this process must ensure a prompt and anonymous resolution of the matter, including on appeal. *Id.* Subsequent decisions have framed *Bellotti*'s core requirements as four-fold: (1) allowing a bypass where the minor "is mature enough and well enough informed to make the abortion decision independently"; (2) allowing a bypass where "the abortion would be in [the minor's] best interests"; (3) "ensuring the minor's anonymity"; and (4) providing for "expeditious bypass procedures." *Manning v. Hunt,* 119 F.3d 254, 263 (4th Cir. 1997) (citation omitted).

*Bellotti*'s holding was reaffirmed in *Casey*. 505 U.S. at 895, 899. Decisions have therefore recognized that failure to comply with these requirements "impose[ ] an undue burden on a minor's right to choose." *Anspach v. City of Philadelphia*, No. Civ.A 05-810, 2005 WL 1519014, at *5 (E.D. Pa. June 27, 2005), *aff'd*, 503 F.3d 256 (3d Cir. 2007). *See also Causeway Med. Suite v. Ieyoub,* 905 F. Supp. 360, 366 (E.D. La. 1995), *aff'd,* 109 F.3d 1096 (5th Cir. 1997) (equating the *Bellotti* standard with the undue burden standard); *Planned Parenthood v. LaWall,* 189 F. Supp. 2d 975, 979-80 (D. Ariz. 2001), *aff'd*, 307 F.3d 783 (9th Cir. 2002) (same).

**3.    *Bellotti* requires that a mature minor be able to obtain an abortion without parental involvement and Indiana Code § 16-34-2-4 (eff. July 1, 2017), which allows for parental involvement through notice, even if the minor is found to be mature, is unconstitutional**

The plurality opinion in *Bellotti* discussed not only the statutory requirement concerning the waiver of parental consent, but also the fact that the challenged statute, as construed by the state court, "requires parental notice in virtually every case where the parent is available." 443 U.S. at 631. The Court agreed with the district court that this provision was unconstitutional. *Id.*

[14]

at 631, 651. "[U]nder state regulation such as that undertaken by Massachusetts, every minor must have the opportunity if she so desires to go directly to a court without consulting or notifying her parents." *Id.* at 647. Notice can be avoided as "there are parents who would obstruct, and perhaps altogether prevent, the minor's right to go to court." *Id.* at 647 (quotation marks and citation omitted).

Under *Bellotti* it is clear that Indiana Code § 16-34-2-4 (eff. July 1, 2017) is unconstitutional as the statute provides that a juvenile court may order parental notice even if the court concludes that the minor is mature enough to make the abortion decision independently. Subsequent to *Bellotti*, the Court in *City of Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416 (1983) ("*Akron I*"), *overruled on other grounds by Casey*, commented on an Ohio law that could be construed as requiring parental notice if a minor sought to obtain judicial approval for an abortion and noted that such a "requirement [ ] in the case of a mature minor seeking an abortion would be unconstitutional." *Id.* at 442 n.31.[10] Since *Akron I*, however, the Supreme Court has repeatedly "declined to decide whether a parental notification statute must include some sort of bypass provision to be constitutional." *Lambert v. Wicklund*, 520 U.S. 292, 295 (1997) (referring to *Ohio v. Akron Center for Reproductive Health*, 497 U.S. 502, 510 (1990) (*Akron II*)). Instead, the Court has ruled in cases where a *Bellotti* bypass procedure was present allowing notice, as well as consent, to be waived and has stated that a judicial bypass procedure for notice that meet the *Bellotti* standard is "*a fortiori*" constitutional, without saying that it is constitutionally required. *See Akron II*, 497 U.S. at 510 ("[A]lthough our cases have required bypass procedures for parental consent statutes, we have not yet decided whether

---

[10]       As with *Danforth*, the Court in *Casey* overruled *Akron* to the extent that *Akron* rejected the notion that a state can have a legitimate goal of protecting fetal life and expressing a preference for childbirth over adoption. *Casey*, 505 U.S. at 883.

parental notice statutes must contain such procedures."); *see also Hodgson v. Minnesota*, 497 U.S. 417, 497-501 (1990) (upholding a statute requiring that both parents receive notice with a "*Bellotti*-type" bypass alternative).[11]

In the period of time before *Lambert* and *Akron II*, the Seventh Circuit held that the *Bellotti* "standard also applies to *notice* statutes." *Zbaraz v. Madigan*, 572 F.3d 370, 380 (7th Cir. 2009) (*Zbaraz II*) (emphasis in original) (citing *Zbaraz v. Hartigan*, 763 F. 2d 1532, 1539 (7th Cir. 1985), *aff'd*, 484 U.S. 171 (1987) (*Zbaraz I*); *Ind. Planned Parenthood Affiliates Ass'n, Inc. v. Pearson*, 716 F.2d 1127, 1132 (7th Cir. 1983)). In *Pearson* the court concluded that *Bellotti* applied to notice as well as consent statutes because "as a practical matter, a notification requirement will have the same deterrent effect on a minor seeking an abortion as a consent statute has." 716 F.2d at 1132. Similarly, in *Zbaraz I*, the Seventh Circuit noted that the *Bellotti* "standard also governs provisions requiring parental notification." 763 F.2d at 1539. But, faced with Supreme Court decisions stating that whether the *Bellotti* standards directly apply to notice statutes is an open question, the Seventh Circuit has noted that its earlier holdings that these standards do apply in such situations have been undercut. *Zbaraz II,* 572 F.3d at 380. However, the court in *Zbaraz II* found it unnecessary to revisit its earlier holdings in *Pearson* and *Zbaraz I* as the statute at issue in that case contained a bypass procedure that met all requirements imposed by *Bellotti* concerning judicial proceedings to bypass parental consent requirements. *Id.*

*Pearson* and *Zbaraz I* recognize that although *Bellotti* focused on parental notice, the underlying concern—a parent's ability to prevent even a mature minor from exercising her decision to have an abortion—is no less relevant in the context of a parental notification

---

[11]    In *H.L. v. Matheson*, 450 U.S. 398 (1981), the Court found that a statute requiring parental notice was not unconstitutional in a situation where there has been no claim made that the child is mature enough to make the abortion decision on her own and where no showing has been made as to the relationship between the minor and her parents. *Id* at 407. The case is of no relevance here where the Indiana statute allows for notice even if the minor is found to be mature and even if it is determined that it is in her best interests to obtain an abortion.

requirement. Other courts have continued to recognize this as well. In *Causeway Medical Suite v. Ieyoub*, 109 F.3d 1096 (5th Cir. 1997), *overruled on other grounds by Okpalobi v. Foster,* 244 F.3d 405 (5th Cir. 2001), the court concluded that a statute that, similar to Indiana's, provided that the juvenile court shall notify parents of a minor's bypass if the court determines that it is in the best interest to do so was unconstitutional.

> The central thrust of *Bellotti* [ ] was to ensure that minors who could not or would not seek the consent of a parent or legal guardian have access to a bypass procedure that would ensure anonymity from parents who may "obstruct both an abortion and their access to court." By requiring a juvenile court judge to notify a minor's parents if the judge finds that doing so would be in the minor's best interest, Louisiana has undermined the independent bypass procedure prescribed in *Bellotti.*

*Id.* at 1112 (internal citation omitted).

In *Planned Parenthood, Sioux Falls Clinic v. Miller*, 63 F.3d 1452 (8th Cir. 1995), a South Dakota statute was challenged that required parental notice, unless there was a medical emergency or the minor was abused or neglected. *Id.* at 1454 n.2. It therefore did not provide "an alternative to parental notice for mature or 'best interest' minors who have not been mistreated." *Id.* at 1458. This was problematic as the notice to the parent provides "the parent the opportunity to obstruct the daughter's choice, just as requiring consent gives the parents the tools with which to do so." *Id.* at 1459. The facts bear this out, as they demonstrate that parental notice can operate as a de facto veto on a minor's decision to obtain an abortion. (Smith ¶¶ 15-16; Beeley ¶ 22; Flood ¶ 9; Pinto ¶¶ 14–15, 19, Lucido ¶¶ 8-12, 25). And fear of such a *de facto* veto or other grave consequences will deter other minors from seeking a bypass at all. (Smith ¶ 20; Flood ¶¶ 13-14; Glynn ¶ 17; Pinto ¶¶ 19, 28, 30; Lucido ¶¶ 22-23). The court in *Miller* concluded that to the extent that the statute could allow a parent to receive notice, even if the minor was mature enough to make the abortion decision independently, or if it was in the best interests of the minor

[17]

that she receive an abortion, the statute violated due process. "In short, parental-notice provisions, like parental-consent provisions, are unconstitutional without a *Bellotti*-type bypass." *Id.* at 1460; *see also Nova Systems v. Fogarty*, No. 01-cv-419-K, 2002 WL 32595281, at *8 (N.D. Okla. June 14, 2002) (reaching the same conclusion).[12]

Indiana Code § 16-34-2-4 (eff. July 1, 2017) does not contain a *Bellotti*-type bypass for notice as it allows a juvenile court to provide notice even if maturity is found. It is a clear outlier in this regard, for every state but one with a parental-notice statute provides for a waiver of such notice at least upon a demonstration of maturity.[13] If nothing else, *Bellotti* recognizes that once

---

[12]     In *Planned Parenthood of Blue Ridge v. Cambos*, 155 F.3d 352 (4th Cir. 1998), the court concluded that a Virginia parental notice statute was constitutional and noted that a parental notice statute was not required to have a *Bellotti*-type bypass procedures. *Id.* at 359. Nevertheless, after lengthy analysis the court concluded that "Virginia courts could readily interpret the Commonwealth's parental notice statute to satisfy the *Bellotti* [ ] requirements, and therefore it would be premature for us, as a federal court, to question its facial constitutionality." *Id.* at 378. The ambiguity in the then-existing statute has since been resolved by Virginia's legislature, for that state has since implemented a parental-consent statute rather than a parental-notice statute, whereby notice is only required if a court determines (a) that a minor is not sufficiently mature to make the abortion decision, (b) that an abortion is nonetheless in the minor's best interest, and (c) that parental notification is also in the minor's best interest. *See* 2003 Virginia Acts ch. 960(1) (now codified at Va. Code § 16.1-241(W)).

[13]     Of the seventeen states that impose a notice requirement on unemancipated minors seeking an abortion, fourteen have a judicial bypass procedure whereby the young woman may establish that she is sufficiently mature to make the abortion decision without notifying her parent(s). *See* Alaska Stat. § 18.16.030; Colo. Rev. Stat. § 12-37.5-105; Del. Code tit. 24, § 1784; Fla. Stat. ch. 390.01114; Ga. Code § 15-11-682; 750 Ill. Comp. Stat. 70/25; Iowa Code § 135L.3; Minn. Stat. § 144.343; N.H. Rev. Stat. 132.34; Ohio Rev. Code § 1251.85; S.D. Codified Laws § 34-23A-7; Tex. Fam. Code § 33.002; W. Va. Code § 16-2F-4; Wyo. Stat. § 35-6-118. (The Alaska Supreme Court has determined the Alaska statute cited immediately above to be unconstitutional under the state constitution insofar as parental notice is not required for all pregnant minors but only for those seeking to terminate their pregnancy and that statute has therefore been enjoined, *see Planned Parenthood of Great Nw. v. State*, 375 P.3d 1122, 1143-45 (Alaska 2016); and although the Minnesota statute requires notification without a bypass procedure, *see* Minn. Stat. § 144.343(2), that provision was held unconstitutional in *Hodgson*, 497 U.S. at 453-54, thus triggering the *Bellotti*-type bypass procedure specified in § 144.343(6)). Virginia has a traditional consent statute with a bypass procedure, although if the court determines that a minor is not sufficiently mature to make the abortion decision but that the abortion is nonetheless in the minor's best interest, the minor's ability to obtain the abortion is conditioned on notice being provided to the parent unless the court also finds that notice is not in the minor's best interest; the notice requirement is never even triggered for a mature minor. *See* Va. Code § 16.1-241(W). And Maryland does not have a *judicial* bypass procedure applicable to its notice requirement, but notice is not required if the physician performing the abortion certifies that the minor is sufficiently mature to make the abortion decision or if notification is not in the minor's best interest. *See* Md. Code., Health–Gen. I §20-103.

Utah alone imposes a notice requirement without any bypass procedure, *see* Utah Code § 76-7-304, although the U.S. Supreme Court has intimated that the requirement might be unconstitutional as applied to a mature minor. *See H.L.*, 450 U.S. at 411 (upholding the statute "[a]s applied to immature and dependent minors" in part because, "as applied to that class, the statute serves a significant state interest by providing an opportunity for parents to

maturity is found, the State has no interest in interfering with the abortion decision. The challenged statute does exactly that and is unconstitutional.

### 4. Regardless of *Bellotti*, Indiana Code §16-34-2-4 (eff. July 1, 2017) is unconstitutional as it imposes an undue burden on minors

Even setting aside *Bellotti*'s specific bypass requirements, the new consent statute is unconstitutional because it imposes an undue burden on minors. *See Manning*, 119 F.3d at 263 (noting that courts must consider whether a parental involvement law "is an undue burden irrespective of *Bellotti*"). The consequences to pregnant minors faced with a statute that allows parental notice, even if they are deemed to be mature enough to make the abortion decision independently, is clear. The young women uniformly express concern that their parents might find out about the abortions. Many have significant and justifiable fear of the adverse consequences that will occur if their parents discover that they intend to seek an abortion and have sought an abortion without parental consent—abuse, punishment, banishment from the home, or the blocking of the abortion. Faced with the possibility that their parents may end up being notified that they are seeking an abortion, a significant number of young women will simply be forced not to pursue the abortion—it will be a deal-breaker.

The Seventh Circuit has commented on the obvious burden that a notice statute will impose. "As a practical matter, a notification requirement will have the same deterrent effect on a minor seeking an abortion as a consent statute has. . . . Although notification requirements do not give parents the legal power to veto their daughter's abortion decision, as a practical matter they may." *Pearson*, 716 F.2d at 1132. In *Pearson*, the statute provided that parents must be told of an unsuccessful bypass application and the court noted that "[i]t is hardly speculative to imagine that even some mature minors will be deterred from going to court if they know that

---

supply essential medical and other information to a physician" and because "[t]he medical, emotional, and psychological consequences of an abortion" may be particularly severe "when the patient is immature").

their parents will be notified if their petitions are denied, because no minor can be certain that the court will rule in her favor." *Id.* at 1141. The same is true here in that no young woman, however sure she is of her maturity, can be certain that a juvenile court will find that it is in her best interests that notice be dispensed with. In *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F. Supp. 2d 1012 (D. Idaho 2005), the statute allowed for abortion without parental consent in the case of a medical emergency, but required parental notice after the abortion. *Id.* at 1015. The court concluded that the failure to provide an exemption from this notice for mature minors would have "a substantial pre-abortion chilling effect for mature minors." *Id.* at 1019-20. Parental notice here is directly analogous to the spousal notice that the Court concluded imposed an undue burden in *Casey* as it could lead to abuse, coercion, or other forms of psychological intimidation: "[w]hether the prospect of notification itself deters such women from seeking abortions, or whether the husband, through physical force or psychological pressure or economic coercion, prevents his wife from obtaining an abortion until it is too late, the notice requirement will often be tantamount to the veto found unconstitutional in *Danforth.*" 505 U.S. at 897.

The burden that the statute will cause on a minor's right to abortion is not overcome by any sufficient interest of the State. The State has no interest in providing notice where the minor establishes maturity, as this law would require. "By showing that they are capable of mature, informed consideration, such minors establish that the State has no legitimate reason for imposing a restriction on their liberty interests that it could not impose on adult women." *Miller*, 63 F.3d at 1460. And, certainly, there is no state interest served where a court notifies a minor's parent of her desire to have an abortion before she has even had an opportunity to demonstrate her maturity, as the law allows. There is also nothing in the statute to preclude the juvenile court from denying the abortion request and then finding that it is in the best interests of the minor that

[20]

her parents be informed that she sought a judicial bypass. Although the State has an interest in assisting parents in protecting the best interests of the immature minor, *see, e.g.*, *Matheson*, 450 U.S. at 409-10, "the state's interest is as fulfilled when the petition is simply denied as it is when the pregnant minor never goes to court to seek a waiver," *Pearson*, 716 F.3d at 1141. The notice at this point serves no purpose except to heap potential adverse consequences on the minor.

The parental notice amendments to Indiana Code § 16-34-2-4 (eff. July 1, 2017) will place a substantial, and unjustified, obstacle in the way of a minor obtaining an abortion. This is an undue burden and is unconstitutional.

**B.**    **The identification and affidavit requirements imposed on physicians are also unconstitutional**

Next, the portions of Section 4 of the Enrolled Act that require physicians to obtain unspecified documents from minors and their consenting parents before an abortion is performed, and to execute an affidavit indicating that a "reasonable person under similar circumstances" would have relied on those documents as evidence of identity and relationship, is unconstitutional for two reasons: they provide no meaningful guidance on the documentation that physicians must review and are therefore unconstitutionally vague in violation of due process; and they require physicians performing an abortion rather than other health center staff to review identifying documents and to execute the requisite affidavit and they violate equal protection.

**1.**    **Indiana Code § 16-34-2-4(a)(3) and Indiana Code § 16-34-3-4(k)(2), which generally require PPINK's physicians to obtain from consenting parents unspecified documentations that a "reasonable" or a "reasonably prudent" person would rely upon to establish the parent's identity, are unconstitutionally vague**

a.    Introduction to vagueness doctrine

"Living under a rule of law entails various suppositions, one of which is that 'all persons are entitled to be informed as to what the State commands or forbids.'" *Papachristou v. City of*

[21]

*Jacksonville*, 405 U.S. 156, 162 (1972) (quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939)) (internal alteration omitted). Accordingly, "[t]he void-for-vagueness doctrine rests on the basic due process principle that a law is unconstitutional if its prohibitions are not clearly defined." *Hegwood v. City of Eau Claire*, 676 F.3d 600, 603 (7th Cir. 2012). While the Constitution does not demand "perfect clarity and precise guidance" of legislative enactments, *see Sherman ex rel. Sherman v. Koch*, 623 F.3d 501, 519 (7th Cir. 2010) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)), it does require that penal statutes define offenses "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (citing cases). Although this doctrine focuses "both on actual notice to citizens and arbitrary enforcement," the U.S. Supreme Court has recognized

> that the more important aspect of vagueness doctrine is not actual notice, but the other principle element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement. Where the legislature fails to provide such minimal guidelines, a criminal statute may permit a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections.

*Id.* at 358 (internal quotations, citations, and alteration omitted). At the same time, the Court has noted that "[t]hese standards should not . . . be mechanically applied," and that "[t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982). Thus, while "economic regulation," "enactments with civil rather than criminal penalties," and statutes containing "a scienter requirement" might be subject to "a less strict vagueness test," a penal statute without those procedural safeguards demands far greater precision. *Id.* at 498-99.

There can be no doubt that the challenged statutes qualify as penal statutes under

[22]

prevailing authority. After all, any physician who performs an abortion on an unemancipated minor without obtaining the proper identification from her parent and executing an affidavit is subject to criminal prosecution, *see* Ind. Code § 16-34-2-7, and the affidavit requirement of course subjects a physician to criminal prosecution for perjury, *see* Ind. Code § 35-44.1-2-1(a)(1). On top of this, the Indiana State Department of Health may revoke PPINK's license to operate as an abortion clinic based on any violation of the law. *See* 410 IAC 26-2-8(b). The Seventh Circuit has been clear that sanctions to a person's license are sufficiently severe to implicate void-for-vagueness concerns as well. *See United States ex rel. Fitzgerald v. Jordan*, 747 F.2d 1120, 1129-30 (7th Cir. 1984); *Baer v. City of Wauwatosa*, 716 F.2d 1117, 1123-24 (7th Cir. 1983). And, of course, vagueness concerns are heightened where, as here, a statute "threatens to inhibit the exercise of constitutionally protected rights." *Village of Hoffman Estates*, 455 U.S. at 499.[14]

### b.   The statutes are vague

It should require no citation to establish that the challenged statutes are hopelessly vague. After all, before a physician performs an abortion on an unemancipated minor she is required to obtain "some evidence"—*in addition to* "government issued proof of identification of the parent"—that "may include identification or other written documentation" capable of providing "an articulable basis for a reasonably prudent person to believe" that the person is who she says she is. Ind. Code § 16-34-2-4(a)(3). The physician is then required to execute an affidavit, under oath, certifying that "a reasonable person under similar circumstances" would rely on the

---

[14]      To be sure, both Indiana Code § 16-34-2-7 and Indiana Code § 35-44.1-2-1(a)(1) contain a *mens rea* requirement, a fact that typically dictates against applying a stringent vagueness test, *see, e.g.*, *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999). As is relevant here, the former statute subjects to criminal prosecution "a person who knowingly or intentionally *performs an abortion* not expressly provided for," and it appears that the *mens rea* requirement requires that the person have knowingly performed the abortion and not that the person have knowingly failed to collect proper documentation. But this is an issue that the Court need not parse at present. After all, as noted, no similar *mens rea* requirement exists with respect to an action taken against PPINK's license—and the fact that the statutes implicate abortion rights likewise dictates heavily in favor of a stringent vagueness test.

information provided "as sufficient evidence of identity and relationship." Ind. Code § 16-34-2-

4(k)(2). The questions abound:

-   Once a parent produces "government issued proof of identification," does it suffice
    for the unemancipated minor to produce similar identification showing that she shares
    a last name with the parent? Does this change if the last name is common, such as
    "Smith" or "Jones"? Does it change if the parent is fairly young, such that judging by
    appearances only he or she might be an older sibling? How would this rule out an
    aunt or an uncle sharing the last name?

-   Is the parent's and minor's oral confirmation of their relationship sufficient to meet
    the requirements of the statute (after all, the "some evidence" required by the statute
    only *may* include "identification or other written documentation)?

-   Does the parent's written affirmation of his or her relationship to the minor alone
    suffice?

-   Under what circumstances would a "reasonably prudent" person accept less "formal"
    documentation—such as a utility bill or school transcript—as evidence of the parent's
    relationship to the minor? Does it suffice if these documents only establish a shared
    residence with the minor?

-   What documents are sufficient for a minor who lacks identification in her name?

The bottom line is that the statutes provide absolutely no meaningful guidance for a physician to

determine what documents she must examine before the minor receives an abortion.

This case cannot be meaningfully distinguished from *Kolender v. Lawson*, *supra*, in

which the U.S. Supreme Court determined unconstitutionally vague a statute that required

persons to provide police officers with "credible and reliable" identification that carried a

"reasonable assurance of its authenticity" and that provided a "means for later getting in touch

with the person." 461 U.S. at 359 (citation omitted). The Court's description of the difficulties in

this language is apt:

At oral argument, the appellants confirmed that a suspect violates [the statute]
unless "the officer is satisfied that the identification is reliable." In giving
examples of how suspects would satisfy the requirement, appellants explained
that a jogger, who was not carrying identification, could, depending on the
particular officer, be required to answer a series of questions concerning the route

[24]

that he followed to arrive at the place where the officers detained him, or could satisfy the identification requirement simply by reciting his name and address.

*Id.* at 360 (internal alteration and citation omitted). Under these circumstances, it was deemed "clear that the full discretion accorded to the police to determine whether the suspect has provided a 'credible and reliable' identification necessarily entrusts lawmaking to the moment-to-moment judgment of the policeman on his beat" and that the statute "furnishe[d] a convenient tool for harsh and discriminatory enforcement by local prosecuting officials." *Id.* (internal alteration, quotations, and citation omitted).

Any distinction between a "credible and reliable identification" standard and either a "some evidence . . . that provides an articulable basis for a reasonably prudent person to believe" or an information that "a reasonable person under similar circumstances would rely on" standard is, at best, a semantic distinction. At worst, the terms "some evidence," "may include," "articulable basis," and "under similar circumstances" simply add to the vagueness. How does a "some evidence" standard differ from simply an "evidence" standard? If the evidence collected only *might* include documentation, when is documentation unnecessary? Who is responsible for articulating the basis for the physician's belief, and how detailed must the explanation be? The bottom line is that the statutes fail to afford PPINK or its physicians sufficient guidance to allow them "to conform [their] conduct to the law," and that prosecuting officials—including the Indiana State Department of Health, which may take an action against PPINK's license as an abortion clinic—are afforded virtually unbridled discretion to determine who has violated the law. *See, e.g.*, *Morales*, 527 U.S. at 58-60. The statutes are thus vague "not in the sense that [they] require[] a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." *Id.* at 60 (quoting *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971)).

[25]

The pitfalls of the imprecise statutory scheme here are exacerbated for another reason. As in *Colautti v. Franklin*, 439 U.S. 379 (1979)—where the Court invalidated, on vagueness grounds, a statute prohibiting certain abortion procedures when the fetus "is viable" or when there is "sufficient reason to believe that the fetus may be viable"—"the uncertainty induced by the statute[s] threatens to inhibit the exercise of constitutionally protected rights." *Id.* at 391 (citing *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972)). If an individual within the Indiana State Department of Health determines that the "some evidence" obtained by a physician is, for one reason or another, inadequate, any action against PPINK's license to operate as an abortion clinic will undoubtedly affect a woman's right to obtain an abortion. And, given particularly the controversial nature of the abortion decision, it is exceedingly easy to envision county prosecutors taking different positions with respect to the amount and type of evidence that satisfies the statutory standard. This is the epitome of vagueness.

> **2. Indiana Code § 16-34-2-4(a)(3) and Indiana Code § 16-34-3-4(k)(2), which require PPINK's physicians—rather than other health center staff—to obtain identifying documentation from consenting parents and to execute an affidavit indicating that a "reasonable person under similar circumstances would rely on" that documentation "as sufficient evidence of identity and relationship," but do not impose similar requirements on physicians performing any other medical procedure, violate equal protection**

The requirement that PPINK's *physicians* obtain documentation establishing identity and relationship from unemancipated minors and their consenting parents before an abortion is performed, and execute an affidavit concerning this fact, also violates rudimentary equal protection principles. Presumably these requirements were enacted to address the possibility of persons misrepresenting themselves to be a minor's parent or guardian so as to enable that minor to obtain an abortion. Here, PPINK does not challenge a statute that simply requires health center staff to obtain documentation concerning a parent's identity and her relationship to the minor

[26]

patient, a theoretical statute that would present a different constitutional question entirely. To the contrary, wholly apart from the vagueness problem noted immediately above, at issue here are two requirements of Indiana's new statutory scheme that appear to be unique not only in Indiana law but also in medical practice: a requirement that physicians, rather than administrative staff, personally examine the identifying documents; and a requirement that the physicians then execute an affidavit concerning their review of the identifying documents. No rational basis supports Indiana's decision to impose these burdens exclusively on the doctors who provide abortions themselves but not on physicians performing any other medical services, and these statutes violate equal protection.

a.      Background to equal protection analysis

"The Equal Protection Clause of the Fourteenth Amendment commands that no state shall 'deny to any person within its jurisdiction the equal protection of the laws,' which essentially is a directi[ve] that all persons similarly situated should be treated alike." *Vision Church v. Village of Long Grove*, 468 F.3d 975, 1000 (7th Cir. 2006) (internal citation omitted). The first step in this analysis "is to identify the [defendants'] classification of groups," which can be accomplished by showing that a statute "imposes different burdens on different classes of people." *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 589 (9th Cir. 2008) (alteration in original) (citations omitted). There can be no doubt that the statutes explicitly imposes requirements on physicians performing abortions but not on those performing any other medical procedure.

The next step in equal protection analysis is to determine the applicable level of scrutiny:

If a [policy] classifies by race, alienage, or national origin, [courts] subject the legislative action to strict scrutiny and it will be sustained only if it is suitably tailored to serve a compelling state interest; these factors are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy. Heightened scrutiny also is appropriate when government action interferes with a person's

[27]

> fundamental rights, such as freedom of speech or religion. If no suspect class or fundamental right is involved, however, [courts] employ a rational basis test to determine whether the [policy] is constitutional.

*Vision Church*, 468 F.3d at 1000–01 (internal quotations, citations, and alterations omitted).

PPINK does not contend that its equal protection claims are subject to anything other than rational basis review. However, even this lowest level of scrutiny, while admittedly not particularly rigorous, is not meaningless. There are numerous examples where the U.S. Supreme Court has found that governmental action fails to satisfy this standard. *See, e.g.*, *Romer v. Evans*, 517 U.S. 620, 626-35 (1996) (invalidating state constitutional amendment prohibiting governmental action to protect homosexual persons from discrimination because no rational basis supported the imposition of the special disability against one class of persons); *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 447–50 (1985) (invalidating zoning ordinance that excluded a group home for persons with intellectual disabilities because there was no rational basis to believe that the group home would pose any special threat to the city's legitimate interests); *Plyler v. Doe*, 457 U.S. 202, 223–30 (1982) (invalidating statute withholding state educational funding for undocumented children because it is not rational to impute a parent's misdeeds to his or her child); *U.S. Dep't of Agriculture v. Moreno*, 413 U.S. 528, 533–38 (1973) (invalidating a statute denying food stamp benefits to households with unrelated persons because, *inter alia*, it was not rationally related to the ostensible purpose of preventing fraud). And in the last few years this Court has twice invalidated regulations imposed exclusively on abortion providers even when applying only low-level scrutiny. *See Planned Parenthood of Ind. & Ky., Inc. v. Commissioner*, 194 F. Supp. 3d 818, 831-34 (S.D. Ind. 2016) (concluding, for purposes of entering a preliminary injunction, that a requirement that fetal and embryonic tissue be treated similarly to a dead body for purposes of disposal likely violated

[28]

substantive due process); *Planned Parenthood of Ind. & Ky., Inc. v. Commissioner*, 64 F. Supp. 3d 1235, 1255-60 (S.D. Ind. 2014) (concluding that physical plant requirements imposed on abortion providers violated equal protection both because they were not imposed on "physician's offices" performing abortions and because abortion providers were statutorily prohibited from obtaining a waiver of these requirements).

The discriminatory classifications here must likewise fall under even this deferential scrutiny, for they are not supported by a rational basis.

> b.      The statutes violate equal protection

As indicated at the outset, the issue presented by PPINK's equal-protection argument is not whether it is rational for Indiana to impose identification requirements on persons obtaining abortions (or their consenting parents) that are not imposed on persons obtaining other medical procedures. Rather, Indiana's new identification statutes are irrational in two respects.

First, it is not rational for the burden of obtaining identifying documents to be placed on PPINK's physicians rather than on other health center staff. Of course, anyone who has ever been to the doctor is aware that it is common practice for clinical staff to accomplish administrative tasks in advance of a medical procedure—from assisting patients in completing necessary paperwork and collecting insurance information to reviewing identifying documents and making copies for the patient's file. Indiana appears to recognize this, for it has not mandated that physicians be responsible for checking identifying documents for any other medical procedure, including the numerous services other than abortion that are provided by PPINK. Indeed, it has not mandated this even with respect to adults seeking abortion services through PPINK or other providers. By nonetheless making physicians performing abortions responsible for checking patients' identifying documents, Indiana has thus ensured that these

documents are reviewed by those who are *least* equipped to do so rather than by health center staff with years of experience reviewing patient identification and other documentation—and by those who are thus least equipped to decide what types of identification a "reasonably prudent" person might believe or to attest to what a "reasonable person under similar circumstances" would rely on. That simply makes no sense, and the statute violates equal protection.

Second, even were it constitutionally permissible to mandate that physicians assume responsibility for reviewing the identifying documents of unemancipated minors and their consenting parents, it is irrational to subject them to the additional burden of executing an affidavit concerning their review of these documents. This is a burden that appears to be unique in the medical profession, and it is one that serves absolutely no purpose. A physician who performs an abortion on an unemancipated minor without obtaining proper consent is already subject to potential criminal and civil liability, *see* Ind. Code § 16-34-2-4.2(c) (eff. July 1, 2017); Ind. Code § 16-34-2-7; Ind. Code § 25-1-9-4(a)(2), (3), as well as to an action against his or her license to practice medicine, *see* Ind. Code § 25-1-9-4(3); 844 IAC 4-6-10. There is clearly no reason to suspect that abortion providers, already aware of the intense scrutiny to which their practice is subjected, are uniquely likely to subvert the identification requirements of Indiana law such that they must execute a separate form attesting to their efforts. Indeed, the affidavit requirement is particularly curious given the long-standing practice in the medical profession (as well as PPINK's practice) of photocopying identifying documents and placing them in each patient's file. There is simply no reason to require physicians to execute a separate affidavit attesting to what a "reasonable person under similar circumstances" would rely on as "sufficient evidence of identity and relationship." The statute is unconstitutional for this reason as well.

**C.    To the extent Indiana Code § 16-32-2-4.2 prevents PPINK from advising patients of legal options for obtaining abortion services it violates the First Amendment**

PPINK's employees and agents regularly provide information to women, including minors, about their options for obtaining a legal abortion in other states. For example, PPINK regularly informs women who need an abortion after 13 weeks, 6 days of pregnancy (the point at which PPINK no longer provides abortions) about the neighboring states in which they can get the care they need. It also informs young women that other states may have less onerous consent requirements than Indiana, that attorneys may be able to assist with legal issues surrounding the consent requirements, and, to the extent that any of these requirements are deemed unconstitutional, it will inform women that the law no longer applies. Indiana Code § 16-34-2-4.2(c) prohibits a person from "knowingly or intentionally aid[ing] or assist[ing] an unemancipated pregnant minor in obtaining an abortion without the consent required" by Indiana Code § 16-34-2-4. Because the parental involvement requirements of the surrounding states do not precisely mirror those of Indiana (particularly as amended by the Enrolled Act), this provision prohibits PPINK from providing vital information about out-of-state options to young women. And it does so in many circumstances even if they have support of a parent.

**1.    PPINK's provision of out-of-state referrals and other information related to Indiana's consent requirement is pure speech protected by the First Amendment**

The First Amendment protects "the right of every citizen to reach the minds of willing listeners." *Hill v. Colorado*, 530 U.S. 703, 728 (2000) (internal quotation and citation omitted). "An individual's right to speak is implicated when information he or she possesses is subjected to restraints on the way in which the information might be used or disseminated." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 568-69 (2011). Here, PPINK's dissemination of information and

advice to women seeking abortions is entitled to the highest level of protection. *See Bigelow v. Virginia*, 421 U.S. 809, 817 (1975); *Tinker v. Des Moines Independent Com. Sch. Dist.*, 393 U.S. 503, 505-506 (1969). Of course, "it is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 828 (1995) (citing *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 96 (1972)). Because Indiana Code § 16-34-2-4.2(c) prohibits the message that PPINK wants to convey, it is a content-based restriction that is presumptively unconstitutional and subject to strict scrutiny. *Reed v. Town of Gilbert, Ariz.*, --U.S.--, 135 S.Ct. 2218, 2226-27 (2015).

### 2. Indiana Code § 16-34-2-4.2(c)'s content-based restriction on PPINK's speech fails strict scrutiny and is unconstitutional

The State must therefore demonstrate that Indiana Code § 16-34-2-4.2(c) is "necessary to serve a compelling state interest [and] narrowly [tailored] to achieve that end." *Perry Ed. Assn. v. Perry Local Educator's Association,* 460 U.S. 37, 45 (1983).[15] The State has no interest in prohibiting the dissemination of information about legal abortions in other states. *See Bigelow*, 421 U.S. at 828; *Meadowbrook Women's Clinic, P.A. v. State of Minn.*, 557 F. Supp. 1172, 1178 (D. Minn. 1983). In *Bigelow*, for example, a newspaper in Virginia was convicted under a state law that "made it a misdemeanor, by the sale or circulation of any publication, to encourage or

---

[15]       The Supreme Court has held that the state is given some leeway to regulate professional speech, but has given little guidance as to what constitutes professional speech or the level of scrutiny that should be applied to such speech under the First Amendment. *See, e.g.*, *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 884 (1992); *see also A Woman's Friend Pregnancy Res. Clinic v. Harris*, 153 F. Supp. 3d 1168, 1199-1202 (E.D. Cal. 2015), *aff'd*, 669 F. App'x 495 (9th Cir. 2016). It is clear that Indiana Code § 16-34-2-4.2(c) may not be considered a regulation of professional speech, for it does not target any profession and the speech at issue here could be provided by anyone in that it is not tied to any professional practice, skill, or judgment. *See A Woman's Friend Pregnancy Res. Clinic*, 153 F. Supp. 3d at 1201 (describing professional speech as occurring where the speaker "'exercise[s] judgment on behalf of the client in light of the client's individual needs and circumstances' . . . creating a quasi-fiduciary relationship with their clients" (quoting *Lowe v. SEC*, 472 U.S. 181, 232 (1985) (White, J., concurring))). Regardless, even were a standard for professional speech applied, the statute would not satisfy even more lenient First Amendment scrutiny because prohibiting speech about legal practices and services for obtaining an abortion is not related to any legitimate state interest. *See id.* at 1202-06 (describing a continuum of scrutiny for professional speech but ultimately applying intermediate scrutiny).

prompt the procuring of an abortion," after it published an advertisement for an abortion clinic in New York. *Bigelow*, 421 U.S. at 811. The Court found that the advertisements constituted "pure speech" that "contained factual material of clear public interest," and that that there was no legitimate governmental interest that could justify prohibiting that speech. *Id.* at 817, 828. The Court held that the state's "interest in shielding its citizens from information about activities outside Virginia's borders, activities that Virginia's police powers do not reach . . . was entitled to little, if any, weight." *Id.* at 828; *see also Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 350 (1986) (Brennan, J. dissenting) ("We have . . . consistently invalidated restrictions designed to deprive consumers of accurate information about products and services legally offered for sale.") (citing precedent from the U.S. Supreme Court concerning legal services, contraceptives, housing, and pharmaceuticals, as well as abortions).

The State here has no compelling interest in prohibiting information and advice about abortion services, including the availability of legal out-of-state abortions, and the statute cannot meet strict scrutiny or even low level scrutiny. There is no doubt that providing such information is protected speech, and Indiana Code § 16-34-2-4.2(c) must be enjoined to prevent a violation of PPINK's First Amendment right to provide its patients with vital information concerning their options for obtaining legal abortions.[16]

---

[16]   To the extent the state asserts an interest in preventing abortions in Indiana that do not comply with the requirements of Indiana law, it is not "narrowly drawn to achieve that end." *Perry Ed. Assn.*, 460 U.S. at 45. In *Meadowbrook Women's Clinic, P.A.*, for example, a Minnesota statute prohibited advertisements for certain medical services, including abortion services, which in turn prevented the plaintiff from advertising its abortion services in the phonebook. *Meadowbrook Women's Clinic, P.A.*, 557 F. Supp. at 1172. While the court held that the state could "regulate commercial speech which is false, deceptive, or misleading, or which proposes illegal transactions . . . [t]he state could not . . . suppress the dissemination of truthful information about lawful activities merely because of the effect such information would have on its recipients." *Id.* at 1177-78. The court held further "if the statute is designed to prevent illegal transactions . . . the statute is overbroad since it prevents the dissemination of information concerning clearly legal activities." *Id.* at 1178. Similarly here, Indiana Code § 16-34-2-4.2(c) is overbroad by prohibiting information about perfectly legal abortion practices in other states. The statute is not narrowly tailored and fails the requisite scrutiny on this ground as well.

[33]

## II. The other requirements for a preliminary injunction are met here

*Irreparable harm for which there is no adequate legal remedy* — It is well-established that the denial of constitutional rights is irreparable harm in and of itself. "Courts have . . . held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights." *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002); *see also, e.g., Cohen v. Coahoma County, Miss.*, 805 F. Supp. 398, 406 (N.D. Miss. 1992) ("It has repeatedly been recognized by the federal courts at all levels that a violation of constitutional rights constitutes irreparable harm as a matter of law."). Here PPINK is facing the denial of its constitutional rights and those of its patients and staff. This is irreparable harm for which there is no remedy at law.

*The balance of harms* — "The more likely it is that [the moving party] will win its case on the merits, the less the balance of harms need weigh in its favor." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.*, 549 F.3d 1079, 1100 (7th Cir. 2008) (internal citation omitted). PPINK will prevail on the merits of its claim here so there is no need to further address the balance, which, at any rate, clearly tips strongly in its favor. This will not injure the defendants. Moreover, a preliminary injunction merely requires defendants to comply with the Constitution, which they cannot claim is harmful. *See Christian Legal Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006) (holding that if a governmental entity "is applying [a] policy in a manner that violates [the plaintiff's] First Amendment rights . . . then [the] claimed harm is no harm at all"). In contrast, for the reasons discussed above, PPINK and its patients are at imminent risk of significant harms, including threats to young women's physical safety and ability to decide whether to have an abortion. The balance of harms favors relief.

*The public interest* — As this Court noted in its recent decision granting PPINK a

preliminary injunction, "the vindication of constitutional rights serves the public interest." *Planned Parenthood of Indiana & Kentucky, Inc. v. Commissioner*, 194 F. Supp. 3d 818, 836 (S.D. Ind. 2016) (citing *Joelner v. Vill. of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004); *Preston v. Thompson,* 589 F.2d 300, 303 n.3 (7th Cir. 1978)). Thus, the public interest is served by the enforcement of the Constitution and by the grant of a preliminary injunction .

   *The bond requirement* — The issuance of a preliminary injunction will not impose any monetary injuries on the State. In the absence of such injuries, no bond should be required. *See, e.g.*, *Doctor's Assocs.*, *Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996).

**Conclusion**

   This Court should therefore issue an injunction, without bond, against all the defendants, with the exception of the Judge of the Marion Superior Court, Juvenile Division, enjoining:

- The bypass procedure set out in Indiana Code § 16-34-2-4 (eff. July 1, 2017).

- The new requirements contained in Indiana Code § 16-34-2-4(a) and (k) (eff. July 1, 2017), concerning the physician's review of identification and attestation concerning the materials reviewed.

- Indiana Code § 16-34-2-4.2(c).


                              s/ Kenneth J. Falk
                              Kenneth J. Falk
                              No. 6777-49


                              s/ Gavin M. Rose
                              Gavin M. Rose
                              No. 26565-53


                              s/ Jan P. Mensz
                              No. 33798-49
                              Jan P. Mensz
                              ACLU of Indiana

[35]

1031 E. Washington St
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
grose@aclu-in.org
jmensz@aclu-in.org

Jennifer Dalven
Andrew Beck
Motions to Appear *Pro Hac Vice* to be filed
American Civil Liberties
New York, NY 10004
(212) 549-2641
jdalven@aclu.org
abeck@aclu.org

Jennifer Sandman
Melissa Cohen
Motions to Appear *Pro Hac Vice* to be filed
Planned Parenthood Federation of America
123 William St.
New York, NY 10038
(212) 261-4584
jennifer.sandman@ppfa.org
Melissa.cohen@ppfa.org

Attorneys for Plaintiff

## Certificate of Service

I hereby certify that on this 31st day of May, 2017, a copy of the foregoing was filed electronically with the Clerk of this Court. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system and the parties may access this filing through the Court's system:

Thomas M. Fisher
Solicitor General
Office of the Attorney General
tom.fisher@atg.in.gov

Matthew Richard Elliott
Deputy Attorney General
Office of the Attorney General
matthew.elliott@atg.in.gov

[36]

s/ Kenneth J. Falk
Kenneth J. Falk
Attorney at Law