UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PLANNED PARENTHOOD OF INDIANA AND KENTUCKY, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | No. 1:17-cv-01636-SEB-DML |
| vs. | ) ) | |
| COMMISSIONER, INDIANA STATE DEPARTMENT OF HEALTH, MARION COUNTY PROSECUTOR, LAKE COUNTY PROSECUTOR, MONROE COUNTY PROSECUTOR, TIPPECANOE COUNTY PROSECUTOR, MEMBERS OF THE INDIANA MEDICAL LICENSING BOARD, JUDGE, MARION SUPERIOR COURT, JUVENILE DIVISION, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

This cause is before the Court on the Motion for Preliminary Injunction [Docket

No. 6], filed on May 18, 2017. Plaintiff Planned Parenthood of Indiana and Kentucky,

Inc. ("PPINK") seeks to have Defendants Commissioner, Indiana State Department of

Health, Marion County Prosecutor, Lake County Prosecutor, Monroe County Prosecutor,

Tippecanoe County Prosecutor, and Members of the Indiana Medical Licensing Board

(collectively, "the State") enjoined from enforcing Senate Enrolled Act No. 404 ("SEA

404"), set to go into effect on July 1, 2017, which amends Indiana law to impose new

conditions and regulations concerning the provision of abortion services to

unemancipated minors.[1]  The Court heard arguments on June 13, 2017.  Having now

considered those arguments, the parties' evidentiary and written submissions, and the

controlling principles of law, we hereby <u>GRANT</u> Plaintiff's Motion for Preliminary

Injunction.

### **Factual Background**

## I.  **Relevant Statutory and Regulatory Law**

Indiana Code § 16-34-2-1.1(a) provides that an abortion cannot "be performed

except with the voluntary and informed consent of the pregnant woman upon whom the

abortion is to be performed."  If the woman seeking an abortion is an unemancipated

minor, current law requires that the physician performing the abortion obtain the written

consent of one of the minor's parents or legal guardians.  Ind. Code § 16-34-2-4(a)

(amended July 1, 2017).  Indiana law provides a constitutionally-mandated "judicial

bypass" procedure for the parental-consent requirement by which a minor may obtain an

abortion without the consent or knowledge of a parent or guardian if she files a petition in

the juvenile court located in the county where she resides or where the abortion is to be

performed and demonstrates to the court's satisfaction either that she is sufficiently

mature to make the abortion decision independently or that the abortion would be in her

best interests.  Ind. Code § 16-34-2-4(b), (d) (amended July 1, 2017).  Once a petition is

---

[1] Because 42 U.S.C. § 1983 provides that a judicial officer cannot be sued for injunctive relief
"unless a declaratory decree was violated or declaratory relief was unavailable," PPINK seeks
only declaratory relief against Defendant Judge of the Marion Superior Court, Juvenile Division.

filed, the juvenile court must render its decision on the bypass request within 48 hours. Ind. Code § 16-34-2-4(e).

Under the recently enacted legislation (SEA 404), an unemancipated minor is still permitted to seek a judicial bypass from a juvenile court and the court must still waive the parental-consent requirement if she demonstrates maturity or that it is in her best interests to obtain the abortion. Ind. Code § 16-34-2-4(b), (d) (eff. July 1, 2017). However, the amended law alters the judicial bypass procedure by adding a parental-notification requirement that provides in relevant part as follows:

> Unless the juvenile court finds that it is in the best interests of an unemancipated pregnant minor to obtain an abortion without parental notification following a hearing on a [bypass] petition …, a parent, legal guardian, or custodian of a pregnant unemancipated minor is entitled to receive notice of the emancipated [sic] minor's intent to obtain an abortion before the abortion is performed on the unemancipated pregnant minor. The attorney representing the unemancipated pregnant minor shall serve the notice required by this subsection by certified mail or by personal service and provide the court with documentation of the attorney's good faith effort to serve the notice, including any return receipt for a certified mailing.

Ind. Code 16-34-2-4(d) (eff. July 1, 2017). Therefore, even if the juvenile court has found the unemancipated minor sufficiently mature to make the abortion decision independently, absent a best interests finding by the juvenile court, "the court shall, subject to an appeal …, order the attorney representing the unemancipated minor to serve the notice required under subsection (d)." Ind. Code § 16-34-2-4(e) (eff. July 1, 2017).

SEA 404 also imposes new requirements on physicians performing abortions that must be followed before an unemancipated minor can obtain an abortion with parental

consent. Under current Indiana law, a consenting parent is required to evidence his or her consent in writing. Ind. Code § 16-34-2-4(a) (amended July 1, 2017). However, under the amended statute, the physician performing the abortion must obtain government-issued proof of identification from the consenting parent as well as "some evidence, which may include identification or other written documentation, that provides an articulable basis for a reasonably prudent person to believe that the person is the parent." Ind. Code § 16-34-2-4(a)(2), (3) (eff. July 1, 2017). SEA 404 further provides that the physician who obtains such consent must execute a sworn affidavit that contains a

> [c]ertification that, to the physician's best information and belief, a reasonable person under similar circumstances would rely on the information provided by the unemancipated pregnant minor and the unemancipated pregnant minor's parent or legal guardian or custodian as sufficient evidence of identity and relationship.

Ind. Code § 16-34-2-4(k)(2) (eff. July 1, 2017). This affidavit must be included in the minor's medical record. *Id.*

Finally, SEA 404 adds a new section to the current statute that provides that any person (other than the minor's parent, stepparent, grandparent, stepgrandparent, sibling, or stepsibling) who "knowingly or intentionally aid[s] or assist[s] an unemancipated pregnant minor in obtaining an abortion without the consent required" under Indiana law, (Ind. Code § 16-34-2-4.2(c) (eff. July 1, 2017)), is liable for damages, including punitive damages, attorney's fees, and court costs. Ind. Code § 16-34-2-4.2(d) (eff. July 1, 2017). The parties agree that this provision would prohibit PPINK and its physicians from

providing an unemancipated minor information regarding out-of-state abortion services which ostensibly would not require parental consent or notice.

Various penalties can be imposed on abortion providers and their employees for violating portions of SEA 404. A physician who performs an abortion intentionally or knowingly in violation of Indiana law pertaining to parental notice and consent commits a Class A misdemeanor. Ind. Code § 16-34-2-7(b). Additionally, a physician with an Indiana license who commits a crime that has a direct bearing on the physician's ability to practice competently or is harmful to the public or who knowingly violates any state law or rule regulating the medical profession is subject to discipline from the Indiana Medical Licensing Board. Ind. Code § 25-1-9-4(a)(2), (3). Likewise, abortion facilities, such as PPINK, which are licensed by the Indiana State Department of Health pursuant to 410 IAC 26-2-1, are subject to having their licenses revoked or other discipline imposed for a number of reasons, including "permitting, aiding or abetting the commission of any illegal act in an abortion clinic," (410 IAC 26-2-8(b)(1), (2)), or failing to have authorized individuals make entries in medical records. 410 IAC 26-7-2(b)(3).

## II. Plaintiff's Current Policies and Procedures

### A. Minor Abortions with Parental Consent

PPINK is an Indiana not-for-profit corporation that operates a number of health centers in Indiana that provide reproductive health services and comprehensive sexuality education to thousands of women, men, and teens throughout the State. Beeley Decl. ¶ 3. Four of the health centers operated by PPINK in Indiana offer abortion services. Three of

those centers, located in Bloomington, Indianapolis, and Merrillville, offer both surgical abortion services and abortions using only medication. *Id.* ¶¶ 4–5. The fourth center, located in Lafayette, provides only medication abortions. *Id.* ¶ 6. At PPINK, surgical abortions are available through the first trimester of pregnancy, or 13 weeks and 6 days after the first day of a woman's last menstrual period, and medication abortions are available through 70 days after a woman's last menstrual period. *Id.* ¶ 6. PPINK provides abortions to minors at its facilities that offer abortion services consistent with Indiana law. *Id.* ¶ 8.

Under Indiana law, PPINK is required to provide any woman seeking an abortion certain state-mandated information at least 18 hours prior to the abortion. Ind. Code § 16-34-2-1.1(a)(1). PPINK provides this information at the woman's initial visit. At this same visit, the PPINK patient signs all the necessary paperwork, including the consent for the abortion and all other required documents. Beeley Decl. ¶¶ 10–11. If the patient is a minor and her parent consents to the abortion, the parent signs the consent and other required paperwork with the minor at this initial visit. *Id.* ¶ 12. PPINK currently requires both the parent and the minor to provide identification, preferably a photo ID, but does not require any additional forms of identification or other documentation to prove the parental relationship. *Id.* ¶¶ 13–14. At present, non-physician PPINK staff is responsible for reviewing the initial paperwork as well as the parent's and the minor's identifications because physicians usually do not see the patient until the time of the abortion and often are not present at the health center during the initial visit. *Id.* ¶¶ 10, 15.

**B. Minor Abortions Following Judicial Bypass**

While the large majority of abortions that PPINK's physicians perform for minors occur with parental consent, PPINK also performs abortions for minors who do not have a parent's consent and who have instead obtained a judicial bypass of the consent requirement as provided for under Indiana law. Beeley Decl. ¶¶ 9, 19. When a minor indicates to PPINK that she is considering an abortion, PPINK first counsels her to discuss the decision with a parent. If the minor indicates that she still wishes to obtain the abortion, PPINK again counsels her to try to obtain parental consent. However, in some cases, the minor informs PPINK staff that she does not want to or feels she cannot inform her parent(s) that she is pregnant and that she wishes to obtain an abortion. *Id.* ¶¶ 20–21. In this situation, PPINK provides to the minor the telephone number of the "bypass coordinator," informing her that the bypass coordinator is a woman who does not work for PPINK but who maintains a list of attorneys who can discuss with the minor the option of seeking a judicial bypass of the consent requirement in juvenile court and can also represent the minor in court, if she so chooses. *Id.* ¶ 24; Smith Decl. ¶ 6.

The bypass coordinator, who is not an attorney, monitors a floating pool of Marion County attorneys who represent the minors in bypass cases, most of which matters are filed in the Marion Superior Court, Juvenile Division. Smith Decl. ¶¶ 2, 4–5. PPINK does not in any way sponsor the efforts of the bypass coordinator, and, in some cases, the bypass coordinator will be contacted by a minor who is seeking an abortion from a provider other than PPINK. *Id.* ¶ 6. Since October 2011, Indiana's bypass coordinator

has been contacted by approximately 60 minors who expressed an interest in obtaining an abortion without parental consent, most of whom were 17 years of age. *Id.* ¶ 9. Not all of these minors ultimately pursued the bypass process to obtain an abortion in Indiana. *Id.* The bypasses that have been granted to PPINK's patients have generally been based on the juvenile court's finding that the minor was sufficiently mature to make the abortion decision independent of her parents. Beeley Decl. ¶ 26; Flood Decl. ¶ 6; Glynn Decl. ¶ 9.

When contacted by a minor seeking an abortion without parental consent, the bypass coordinator outlines in general fashion the process of obtaining a judicial bypass and what must be demonstrated in court to be granted one. Beeley Decl. ¶ 11. In many cases, this conversation will last for some time, but occasionally the minor will want only basic information from the bypass coordinator and those conversations are brief. *Id.* ¶ 10. During this conversation, the bypass coordinator attempts to make sure that no one is forcing the minor to obtain an abortion and that the minor is certain about her decision. *Id.* ¶ 12. If the minor is interested in pursuing the judicial bypass procedure following this conversation, the bypass coordinator then refers her to an attorney from the pool who explains the bypass hearing procedures in more detail. Glynn Decl. ¶ 14.

Generally, the minors who show interest in pursuing the judicial bypass procedure have not yet told their parents that they are pregnant and are seeking an abortion. Smith Decl. ¶ 14. Over the years, minors in this situation have indicated to PPINK and the bypass coordinator various reasons why they have not told their parents about their

pregnancy and desire to seek an abortion, including fears of being kicked out of the home, of being abused or punished in some way, and/or that their parent(s) will attempt to block the abortion.[2] *Id.* ¶¶ 15–16; Beeley Decl. ¶ 22; Flood Decl. ¶ 9; Dr. Pinto Decl. ¶¶ 14–15, 19; Lucido Decl. ¶¶ 8–12. Other minors simply do not know where their parents are and do not have a legal guardian or custodian who can step in to fulfill the consent requirement. Beeley Decl. ¶ 23; Lucido Decl. ¶ 13. Whatever the particular reason, the young women consistently express fear that their parent(s) will discover that they are pregnant and seeking an abortion. Smith Decl. ¶ 18; Glynn Decl. ¶ 12; Lucido Decl. ¶¶ 8–13. Currently, the bypass coordinator informs the minors that no one involved in the bypass process will notify their parents that they are pregnant or seeking a bypass. Smith Decl. ¶ 18. This assurance will no longer be possible under SEA 404's notice provision.

## C.     Referral Practices

PPINK is regularly contacted by women, including minors, for abortion services and subsequently discovers, either during the initial telephone consultation or during the visit to one of its health centers, that it is unable to perform the abortion or that the individual might prefer to obtain an abortion elsewhere. In some cases, this is because the woman's pregnancy is past the first trimester (the time during which abortions are available in Indiana) or because there are other reasons why it would be desirable or

---

[2] On at least one occasion, the mother of a young woman seeking a judicial bypass discovered her plans through a third party and prevented her from seeking an abortion, instead forcing her to give birth. Glynn Decl. ¶ 13; *see also* Dr. Pinto Decl. ¶ 29.

necessary for the woman to obtain an abortion in another state. Beeley Decl. ¶ 27. In these circumstances, PPINK frequently informs the women, including minors, that they have the option to receive abortion services in states other than Indiana. *Id.* ¶ 28. PPINK is aware, for example, that there are abortion providers in neighboring states, including Illinois, Michigan, Ohio, and Kentucky, who offer abortion services into the second trimester. *Id.* ¶ 29. When applicable, PPINK informs those seeking abortion services of the availability of such services in other states. *Id.*

Similarly, PPINK believes that SEA 404's parental notice requirement and identification/affidavit requirements are more stringent than comparable requirements in Indiana's neighboring states. *Id.* ¶¶ 30–31. PPINK would like to be allowed to inform unemancipated minors who seek abortion services after July 1, 2017 not only of Indiana's requirements, but also of the fact that other states may have less restrictive requirements. *Id.* ¶ 32. It is undisputed that doing so would subject PPINK and its staff to both civil liability and licensing sanctions under the amended statute.

<u>**Legal Analysis**</u>

**I.      Standard of Review**

To obtain a preliminary injunction, the moving party must demonstrate: (1) a reasonable likelihood of success on the merits; (2) no adequate remedy at law; and (3) irreparable harm absent the injunction. *Planned Parenthood of Indiana, Inc. v. Commissioner of Indiana State Dept. of Health*, 699 F.3d 962, 972 (7th Cir. 2012). If the moving party fails to demonstrate any one of these three threshold requirements, the

injunctive relief must be denied. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States, Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008) (citing *Abbot Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992)). However, if these threshold conditions are met, the Court must then assess the balance of the harm—the harm to Plaintiff if the injunction is not issued against the harm to Defendants if it is issued—and determine the effect of an injunction on the public interest. *Id.* "The more likely it is that [the moving party] will win its case on the merits, the less the balance of harms need weigh in its favor." *Id.* at 1100.

## II.    Likelihood of Success on the Merits

### A.    Indiana Code § 16-34-2-4(d), (e)

#### 1. Nature of PPINK's Challenge

In its Response Brief to PPINK's motion and again at oral argument, the State devoted significant time and attention to the fact that PPINK's challenge to SEA 404's parental-notification provision is what is known as a "pre-enforcement facial challenge," meaning, that PPINK has challenged the constitutionality of this statute prior to its implementation and without reference to any specific or individual application of the law.

The State contends that because the nature of PPINK's challenge to SEA 404 relates to the statute's impact on abortion-seeking minors in Indiana—specifically, that the law's effect will place a "substantial obstacle" in the path of those minors—PPINK is obligated to present "actual evidence" of the law's "operational effect" as opposed to

offering "mere hypothesis" of its "likely impact." *See* Defs.' Resp. at 12–15. As the State contends, we cannot know what SEA 404's effects will be, much less if those effects will represent a substantial obstacle to abortion-seeking minors in Indiana, until after the law takes effect on July 1, 2017. It maintains further that, following the law's implementation, the correct path and forum for a challenge would be on an as-applied basis in the State's juvenile courts and on expedited appeal to the Indiana Supreme Court thereafter.

In advancing this argument, the State has touched on an issue for which neither the Supreme Court nor the Seventh Circuit has provided crystal-clear guidance. It appears the State derived this standard from *A Woman's Choice—East Side Women's Clinic v. Newman*, 305 F.3d 684, 693 (7th Cir. 2002), a case in which the Seventh Circuit reversed a district court's injunction restraining enforcement of an informed-consent provision requiring abortion-seeking women in Indiana to attend a second clinic visit so that certain information could be provided to them in person. In *A Woman's Choice*, the Seventh Circuit held that it was an abuse of discretion for the district judge to issue a pre-enforcement injunction of the two-visit provision prior to determination of the law's effects or the reasons for those effects. *Id.*

More precisely, the Seventh Circuit found unpersuasive the evidence accepted by the district court establishing that similar two-visit provisions in Mississippi and Utah reduced by 10% the number of abortions performed in those states as compared to their neighboring states who did not require multiple visits. Though the district court

concluded that a similar provision in Indiana would produce similar results, thereby

creating an undue burden on abortion in Indiana, the Seventh Circuit concluded:

> Because Indiana has been disabled from implementing its law and gathering
> information about actual effects, any uncertainty about the inferences based
> on other states' experience and how that experience would carry over to
> Indiana must be resolved in Indiana's favor.

*Id.* at 687.

Prior to discussing this evidence, however, the Seventh Circuit noted the

incongruity between the Supreme Court's decision in *United States v. Salerno*, 481 U.S.

739 (1987), which stated that, except in First Amendment cases, a law may be held

facially unconstitutional only when "no set of circumstances exists under which the Act

would be valid," and the Court's subsequent decisions in both *Planned Parenthood v.*

*Casey*, 505 U.S. 833, 847 (1992) and *Stenberg v. Carhart*, 530 U.S. 914 (2000), where

the Court, faced with pre-enforcement facial challenges, held invalid a statute forbidding

the use of the "intact dilation and extraction" method of abortion (*Stenberg*) and a statute

requiring a woman to provide spousal notification before obtaining an abortion (*Casey*).

*See A Woman's Choice*, 305 F.3d at 687, 691. Judge Easterbrook, writing for the panel,

described these cases as "irreconcilable directives from the Supreme Court," but

concluded that, given their incompatibility, the language of *Salerno* must give way to the

subsequent holdings in *Stenberg* and *Casey*. Though recognizing the justiciability of pre-

enforcement facial challenges to abortion regulations in light of *Stenberg* and *Casey*, he

nevertheless distinguished the magnitude of potential harm posed by the two-visit

provision in *A Woman's Choice* as compared to the spousal-notification provision in

*Casey*, stating that "[t]he record in this case does not show that a two-visit rule operates

similarly to a spousal-notification rule by facilitating domestic violence or even inviting

domestic intimidation." *Id.* at 692.

    As we understand it, and as the Seventh Circuit described it, the severity and

character of harm presented by certain abortion restrictions render them vulnerable to

pre-enforcement facial challenges. And while it may be difficult to neatly sort out the

restrictions that fall into this category and those that do not, our task is simplified here.

The Supreme Court in *Casey* enjoined enforcement of a spousal-notification statute,

finding that the effects of requiring spousal notice—which, in some cases, would include

domestic physical and psychological abuse and obstruction—were simply too great to

countenance. We find the same to be true here. As explained below, for many young

women in Indiana, the requirement of providing parental notification before obtaining an

abortion carries with it the threat of domestic abuse, intimidation, coercion, and actual

physical obstruction. The State's argument that those seeking to challenge the law must

wait until evidence of this type of harm accrues is simply incorrect. The Court need not

sit idly by while those most vulnerable among us are subjected to unspeakable and horrid

acts of violence and perversion, nor may we blind ourselves to the fact that for millions

of children (including young women) in the United States the threat of such abuse is real.

*See e.g.,* Dr. Pinto Decl. ¶ 10.

We pause, however, to acknowledge that the likelihood of such harm is not present in the large majority of cases.  At least that is our hope and assumption.  In well-functioning families, a child will find it both helpful and safe to discuss her pregnancy and the decision whether to bear a child with her most-trusted advisors and confidants, which group typically includes her parents.  PPINK itself recognizes the importance of parental consultation within the ideal family structure, which, presumably, is the reason the organization advises every minor who expresses her desire to obtain an abortion to first discuss the matter with her parents.  *See* Beeley Decl. ¶ 20.  In fact, PPINK's data from fiscal year 2015 shows that 96.3% of minors who had abortions at PPINK did so with the legal consent of a parent or legal guardian.  *Id.* ¶ 9.  But we cannot limit our analysis or our concerns only to the majority of cases; for most minors, if past experience holds true, SEA 404's proposed amendments are neither restrictive nor relevant.

The fact that minors in well-functioning families are not likely to face these problems does not alter the hardship created by the notice requirement on its face. We turn our analysis now to those minors described above, namely, those who face the possibility of interference, obstruction, or physical, psychological, or mental abuse by their parents if they were required to disclose their pregnancy and/or attempt to obtain an abortion.  And, as discussed in detail below, that hardship is more than merely a state-created disincentive; rather, it represents a substantial state-imposed obstacle to the exercise of the minor woman's free choice.  Given that "[t]he proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for

whom the law is irrelevant," *Casey*, 505 U.S. at 894, we find that SEA 404's parental-notification provision will create an undue burden for a sufficiently large fraction of mature, abortion-seeking minors in Indiana. It is, therefore, unconstitutional and invalid on its face. *See Whole Woman's Health v. Hellerstedt*, 136 S.Ct. 2292, 2320 (2016).

### 2. Undue Burden

The primary issue presented by this case is whether the parental-notification requirements of Ind. Code § 16-34-2-4(d), (e) (eff. July 1, 2017) create an "undue burden" for abortion-seeking minors in Indiana.

It serves us well in seeking to resolve this issue to return to the landmark decision in *Roe v. Wade*, 410 U.S. 113 (1973), in which the Supreme Court announced that a woman's Constitutional rights to privacy and liberty, as derived from the Due Process Clause of the Fourteenth Amendment, are "broad enough to encompass a woman's decision whether or not to terminate her pregnancy." *Roe*, 410 U.S. at 153. Reaffirming this "most central principle of *Roe v. Wade*," in *Planned Parenthood v. Casey*, 505 U.S. 833, 847 (1992), a plurality of the Court wrote that "[i]t is a promise of the Constitution that there is a realm of personal liberty which the government may not enter." Implicit in that promise is the "right of an individual…to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Id.* at 851–52 (citing *Eisenstadt v. Baird,* 405 U.S. 438, 453 (1972)).

Indeed, the Supreme Court has recognized that when it comes to the abortion decision, "the liberty of the woman is at stake in a sense unique to the human condition

and so unique to the law." *Id.* at 852. The effect of state regulation of woman's choice to have an abortion touches not only upon the private sphere of the family but also upon the bodily integrity of the pregnant woman and is, therefore, "doubly deserving of scrutiny." *Id.* at 896. Accordingly, States are prohibited from enacting legislation which places an "undue burden" on a woman's ability to make the abortion decision—*i.e.,* legislation having the effect of placing a "substantial obstacle" in the path of the woman's choice. *Id.* at 877.[3]

Among the restrictions proscribed by the Court's ruling in *Casey* were statutes requiring a woman to provide notice to her spouse prior to an abortion. The Court found that requiring such notification was "likely to prevent a significant number of women from obtaining an abortion. [Notice] does not merely make abortions a little more difficult or expensive to obtain; for many women, it will impose a substantial obstacle." *Id.* at 893–94. It has thus become the law of the land that a woman's right to privacy as forefended by the Fourteenth Amendment prevents the States from requiring her to provide notification of her decision to have an abortion.

The question now before the Court is whether this rule also extends to unemancipated minors by preventing States from requiring them to give notice to their

---

[3] "The three-Justice lead opinion in *Casey* is in some parts the opinion of the Court and in some the limiting concurrence. Although the undue burden test was endorsed by only three justices, as the narrowest ground for the Court's holding it is as binding on the lower courts as would be a majority opinion." *Planned Parenthood of Idaho v. Wasden*, 376 F.3d 908, 921 n.11 (9th Cir. 2004) (citing *Marks v. United States*, 430 U.S. 188, 193 (1977)).

parents in all cases except where they are able to satisfy a juvenile court judge that obtaining an abortion without notice is in their best interests.

It is well settled that the rights to privacy and liberty, like many constitutional rights, extend in full force to minors. *Bellotti v. Baird*, 443 U.S. 622, 633 (1979) (Powell, J.) ("A child, merely on account of h[er] minority, is not beyond the protection of the Constitution."); *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 74 (1976) ("Minors, as well as adults, are protected by the Constitution and possess constitutional rights."). This means that, for both the adult and the minor woman, state-imposed burdens on the abortion decision can be justified only upon a showing that the restrictions advance "important state interests." *Roe v. Wade*, 410 U.S. at 154, *accord, Danforth*, 428 U.S. at 61.

The difference between abortion regulations concerning adults and those concerning minors is that certain important state interests not present in the case of an adult woman must be considered and weighed against the minor's rights to privacy. In addition to the State's interests in the preservation of fetal life and encouraging childbirth rather than abortion, *cf. Maher v. Roe*, 432 U.S. 464 (1977); *Harris v. McRae*, 448 U.S. 297 (1980), the law recognizes legitimate state interests in protecting children and adolescents, preserving family integrity, and encouraging parental authority.

It has long been accepted that "[c]hildren have a very special place in life which law should reflect." *May v. Anderson*, 345 U.S. 528, 536 (1953) (Frankfurter, J., concurring). "[D]uring the formative years of childhood and adolescence, minors often

lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them." *Bellotti*, 443 U.S. at 635. In recognition of these vulnerabilities, the Court has held that the State may validly limit the freedom of children to choose for themselves in the making of important choices that entail potentially serious consequences, including the decision whether to seek an abortion. *Id.* (collecting cases).

Often, the preferred method by which a state may limit a child's decision-making freedom is to encourage parental consultation: "As immature minors often lack the ability to make fully informed choices that take account of both immediate and long-range consequences, a State reasonably may determine that parental consultation often is desirable and in the best interest of the minor." *Id.* at 640.

Indeed, in most cases, parental consultation is more than desirable; it is fundamental. It is deeply rooted in our Nation's history and tradition as well as our jurisprudence, that "the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944). The duty to prepare the child for these obligations "must be read to include the inculcation of moral standards, religious beliefs, and elements of good citizenship." *Wisconsin v. Yoder*, 406 U.S. 205, 233 (1972). This process of child rearing has long been understood to be, in large part, "beyond the competence of impersonal political institutions," *Bellotti*, 443 U.S. at 638, and should, therefore, be left to the family—the institution through which "we inculcate and pass down many of our most cherished values, moral and

cultural." *Moore v. East Cleveland*, 431 U.S. 494, 503–504 (1977). Concomitant with our Nation's deep-rooted respect for the private realm of the family is the parents' "traditional and substantial interest in, as well as a responsibility for, the rearing and welfare of their children, especially during immature years." *H. L. v. Matheson*, 450 U.S. 398, 419 (1981) (Powell, J., concurring) (citing *Bellotti*, 443 U.S. at 637–639).

In the context of deciding on whether to undergo an abortion, however, these state interests in protecting children and preserving the family, important as they are, are not without limits; at times, the State must in certain instances yield to the pregnant minor's interests in her own privacy and bodily integrity, for, as we noted previously, the abortion decision necessarily entails long-term consequences unique to the human condition and must therefore be considered unique also in the eyes of the law.

Recognizing these limitations in *Planned Parenthood v. Danforth*, the Supreme Court held unconstitutional a law requiring an unmarried minor to obtain the written consent of a parent or person *in loco parentis* prior to an abortion in all cases except those where a licensed physician had certified the abortion as necessary in order to preserve the life of the mother. 428 U.S at 72, *overruled on other grounds by Casey,* 505 U.S. 833. There, the Court held that "[j]ust as with the requirement of consent from the spouse, so here, the State does not have the constitutional authority to give a third party an absolute, and possibly arbitrary, veto over the decision of the physician and his patient to terminate the patient's pregnancy, regardless of the reason for withholding consent." *Id.* at 74.

Though the *Danforth* Court acknowledged the longstanding acceptance of the State's "somewhat broader" authority to regulate the freedom of children than of adults, it nevertheless rested its decision on two points: first, "Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority"; and, second, "Any independent interest the parent may have in the termination of the minor daughter's pregnancy is no more weighty than the right of privacy of the competent minor mature enough to have become pregnant." *Id.* at 74–75. The Court thus concluded that, when weighed against one another, the competent and mature minor's interests in privacy and bodily integrity outweighed the State's interest in granting the family, be it parent or spouse, the right to veto the mature minor's decision—a power the State itself did not possess. *Id.*

Three years after *Danforth*, the Court addressed a Massachusetts statute that required parental consent to be obtained for every nonemergency abortion where the mother was less than eighteen years of age and unmarried, with the sole exception being instances where a parent had died, deserted the family, or was otherwise unavailable. *Bellotti*, 443 U.S. 622. Writing for a plurality of the Court, Justice Powell expressly noted that the statute did not "permit[] any minors—mature or immature—to obtain judicial consent to an abortion without any parental consultation whatsoever," but instead mandated that "an available parent must be given notice of any judicial proceedings brought by a minor to obtain consent for an abortion." *Id.* at 646.

The Powell plurality concluded that, when construed in such a manner, the law

imposed an undue burden on the exercise by minors of their right to seek an abortion, and

that, in order to comport with the Constitution, statutes requiring parental consultation

and consent must include an alternative path to an abortion:

> [E]very minor must have the opportunity—if she so desires—to go directly
> to a court without first consulting or notifying her parents. If she satisfies the
> court that she is mature and well enough informed to make intelligently the
> abortion decision on her own, the court must authorize her to act without
> parental consultation or consent. If she fails to satisfy the court that she is
> competent to make this decision independently, she must be permitted to
> show that an abortion nevertheless would be in her best interests. If the court
> is persuaded that it is, the court must authorize the abortion. If, however, the
> court is not persuaded by the minor that she is mature or that the abortion
> would be in her best interests, it may decline to sanction the operation.

*Bellotti*, 443 U.S. at 647–48 (Powell, J.)

This alternative to parental consent described Justice Powell has become known as

a "judicial bypass," which must: (1) allow the minor to bypass parental consent

requirements if she "is mature enough and well enough informed to make the abortion

decision independently"; (2) allow her to bypass consent requirements where the abortion

would be in the minor's best interests; (3) ensure the minor's anonymity; and (4) be

conducted in expeditious fashion. *Lambert v. Wicklund*, 520 U.S. 292, 295 (1997).

In its challenge to SEA 404, PPINK contends that these "judicial bypass"

requirements set out in *Bellotti* for parental-consent statutes should also apply to parental-

notification statutes. If applied in this manner, the *Bellotti* factors would render SEA

404's amendment to Ind. Code § 16-34-2-4(d), (e) unconstitutional, given that the

amendment eliminates a pregnant minor's ability to bypass parental notification through a showing that she is mature enough and well enough informed to make the abortion decision independently.

For years following the *Bellotti* decision, the language of Justice Powell's plurality opinion, which discussed not only parental consent but also parental involvement and consultation in decisionmaking, was interpreted just as PPINK posits, to wit, as expanding the Court's *Danforth* decision forbidding states from providing parents an absolute veto over a mature minor's decision by requiring states to afford mature minors an opportunity to bypass all hostile parental involvement in their decision.

In *H.L. v. Matheson*, 450 U.S. 398, 411 (1981), the Court held that a statute requiring parental notification did not violate the constitutional rights of *immature* and *dependent* minors, concluding that, as applied to those minors, the statute "plainly serve[d] the important considerations of family integrity and protecting adolescents." Though the majority in *Matheson* did not decide whether a notice requirement would be constitutional as applied to emancipated or mature minors, *see id.* at 407 n.14, 412 n.22, five Justices expressed the view that in light of *Bellotti* it would be unconstitutional to apply a notice requirement to minors who could demonstrate their maturity. *See id.* at 420 ("[A] State may not validly require notice to parents in all cases, without providing an independent decisionmaker to whom a pregnant minor can have recourse if she believes that she is mature enough to make the abortion decision independently or that notification otherwise would not be in her best interests. My opinion in *Bellotti* [], joined

by three other Justices, stated at some length the reasons why such a decisionmaker is needed.") (Powell, J., joined by Stewart, J., concurring); *id.* at 451, n.49 ("[U]nder Justice Powell's reasoning in *Bellotti* [], the instant statute is unconstitutional. Not only does it preclude case-by-case consideration of the maturity of the minor, it also prevents individualized review to determine whether parental notice would be harmful to the minor.") (Marshall, J., joined by Brennan and Blackmun, JJ., dissenting).

Then, in *City of Akron v. Akron Center for Reproductive Health* (*"Akron I"*), Justice Powell, writing for the Court, stated in a footnote that an Ohio statute which required parental notification, but contained "no provision for a mature or emancipated minor *completely* to avoid hostile *parental involvement* by demonstrating to the satisfaction of the court that she is capable of exercising her constitutional right to choose an abortion ... would be unconstitutional." 462 U.S. 416, 422 n.31 (1983), *overruled on other grounds by Casey,* 505 U.S. 833 n.3 (citing *Matheson*, 450 U.S. at 420, 428) (emphasis added).

In *Indiana Planned Parenthood Affiliates Ass'n, Inc. v. Pearson*, 716 F.2d 1127, 1131–32 (7th Cir. 1983), the Seventh Circuit applied these Supreme Court cases to a challenge brought by Planned Parenthood as to the constitutionality of an Indiana statute which Planned Parenthood maintained would allow a juvenile court to deny waiver of notice for a concededly mature minor if the court found that notice would be in child's best interests—a challenge almost identical to the one raised by PPINK here. There, the Seventh Circuit held that "[t]he plurality opinion [in *Bellotti*] also concluded that a state

is required to make [the judicial] bypass procedure available under notification statutes as well [as consent statutes]"; therefore, the State cannot constitutionally "give the juvenile court the authority to refuse to waive notification despite a finding that the minor is mature." *Id.* at 1134 (citing *Matheson*, 450 U.S. 398, 454 n.9 (Powell, J., concurring)); *see also Zbaraz v. Madigan*, 763 F.2d 1532, 1539 (7th Cir. 1985) ("*Zbaraz I*") (holding that the *Bellotti* standard "also governs provisions requiring parental notification").

In reaching this conclusion, the Seventh Circuit reasoned that notice statutes should receive the same treatment as consent statutes because, "as a practical matter, a notification requirement will have the same deterrent effect on a minor seeking an abortion as a consent statute has." *Pearson,* 716 F.2 at 1132. It explained:

> Unemancipated minors are fundamentally different from adults because they are financially dependent upon their parents and have numerous legal incapacities. In addition, parents have considerable leeway to impose punishment upon their children for disobedience. Because of this, minors often have no choice but to comply with parental directives.

> Although notification requirements do not give parents the legal power to veto their daughter's abortion decision, as a practical matter they may. "[Y]oung pregnant minors, especially those living at home, are particularly vulnerable to their parents' efforts to obstruct both an abortion and their access to court." *Bellotti* [], 443 U.S. at 647 (plurality opinion of Powell, J.). It was a recognition of this vulnerability that led the plurality in *Bellotti* [] to state that confidentiality was necessary in a waiver-of-consent proceeding. *See id.*

> Because parental involvement brought about by either consent or notification statutes may result in similar efforts by parents to block the abortion, we will apply the Supreme Court's analysis with respect to consent bypass procedures in our consideration of the constitutional sufficiency of Indiana's notification bypass procedures.

*Id.* at 1132.

If we were to rely solely on the reasoning and disposition of *Pearson*, the answer to the question before us would appear relatively straightforward: *Bellotti* forbids a state from requiring parental notification of a minor without affording the minor an opportunity to bypass the notice requirements through a showing of maturity.

However, in the years following the Supreme Court decision in *Akron I*, 462 U.S. 416 (1983), the Court has pulled back from this interpretation of *Bellotti* and its progeny, stating that, "although our cases have required bypass procedures for parental consent statutes, we have not decided whether parental notice statutes must contain such procedures." *Ohio v. Akron Ctr. for Reprod. Health* ("*Akron II*"), 497 U.S. 502, 510–11 (1990) (citing *Matheson*, 450 U.S. at 413). The Court thereafter has repeatedly "declined to decide whether a parental notification statute must include some sort of bypass provision to be constitutional." *Lambert*, 520 U.S. at 295.

In response to the Supreme Court's clarification of *Bellotti*, the Seventh Circuit recognized in *Zbaraz v. Madigan* ("*Zbaraz II*") that its conclusions in *Pearson*, 716 F.2d 1127 and *Zbaraz I*, 763 F.2d 1532 had been premature; to the extent they rested on language from opinions addressing only the constitutional requirements concerning parental-consent statutes they lacked precedential support. 572 F.3d 370, 379–80 (7th Cir. 2009). Much like the Supreme Court in *Akron II*, the Seventh Circuit in *Zbaraz II* declined to decide whether a parental notification statute lacking a *Bellotti*-type bypass violated the Constitution, holding instead that because the Illinois statute at issue in

26

*Zbaraz II* satisfied the *Bellotti* criteria for consent statutes, it therefore *a fortiori* satisfied any criteria that might be required for bypass provisions in notice statutes. *Zbaraz II,* 572 F.3d at 380.[4]

In short, the specific question remains unanswered by the Supreme Court and the Seventh Circuit as to whether a statute requiring parental *notice* must, similar to a parental-*consent* statute, include a provision allowing a minor to bypass parental notice upon showing that she is mature enough and well enough informed to make the decision on her own. In the case before us, we cannot sidestep that issue. Accordingly, we hold that it must. Though not identical in every aspect, state-mandated requirements of parental notice impose many of the same consequential burdens on young women as do state-mandated requirements of parental consent. Indeed, in many cases, requiring notice is tantamount to requiring consent.

We need look no further than the Supreme Court's plurality opinion in *Casey* to understand this fundamental truth. In invalidating Pennsylvania's spousal-notification statute, the Court explained that, although many women in well-functioning marriages

---

[4] The State contends that *Zbaraz II* should be read as stripping *Zbaraz I* and *Pearson* of any controlling weight and that we should look to the Seventh Circuit's pre-*Bellotti* decision in *Wynn v. Carey*, 582 F.2d 1375, 1388 (7th Cir. 1978) for the "proper doctrinal rule" concerning parental-notification statutes. Defs.' Resp. at 5–6. We disagree. The Seventh Circuit recognized in *Zbaraz II* that its prior decisions in *Zbaraz I* and *Pearson* had interpreted the Supreme Court's plurality opinion in *Bellotti* as setting the appropriate standards for parental-notification statutes in addition to parental-consent statutes—an interpretation that "conflicted" with subsequent Supreme Court decisions indicating that *Bellotti* encompassed only parental consent. *See Zbaraz* II, 572 F.3d at 380. The Seventh Circuit did not, however, overturn its decisions in *Pearson* or *Zbaraz I*. Indeed, we find that much of the reasoning expressed in those opinions regarding the impact of requiring parental notice is likely as true today as it was when they were decided.

were likely to discuss the abortion decision with their spouse, the same cannot be said, nor mandated, of all women. *Casey*, 505 U.S. at 892. Millions of women in the United States are victims of regular physical and psychological abuse at the hands of their husbands, said the Court in *Casey*, which abuse results in those women possessing justifiable fears that informing their husbands of their intent to have an abortion could result in further infliction of abuse in the form of "verbal harassment, threats of future violence, the destruction of possessions, physical confinement to the home, the withdrawal of financial support, or the disclosure of the abortion to family and friends." *Id.* at 893.

Ultimately, the *Casey* plurality concluded:

> Whether the prospect of notification itself deters such women from seeking abortions, or whether the husband, through physical force or psychological pressure or economic coercion, prevents his wife from obtaining an abortion until it is too late, the notice requirement will often be tantamount to the veto found unconstitutional in *Danforth.*

*Id.* at 897.

The concerns raised in *Casey* regarding the deleterious effect of state-mandated notice are, if anything, heightened with regard to unemancipated minors, who typically must rely on their parents in ways unique to all other relationships. Unemancipated minors depend on their parents for financial support, housing, and transportation in addition to the many legal incapacities for which the parents must serve as proxy. This unparalleled dependence often constrains a minor's ability to disobey parental directives.

For instance, many minors may encounter post-notification interference from their parents in the form of parental disappointment and disapproval, withdrawal of financial support, or actual obstruction of the abortion decision itself.  In such cases, although the notification may not have granted the parents' legal authority to veto the minor's decision, the practical effect will be one and the same.  *See Pearson*, *supra.*

In addition to actual obstruction, a large number of minors may face the risk of domestic abuse at the hands of one or more of their parents in the event that a parent is notified of the minor's pregnancy.  As Dr. Suzanne Pinto has reported to this Court, millions of children in our country are abused at home each year.  *See* Dr. Pinto Decl. ¶ 10. This abuse can take several forms—physical, sexual, or emotional—and can vary in degree from family to family.  *Id.*  For young women in particular, a key aspect of abuse often involves their sexuality, and, as a physical manifestation of sexual activity, a teen's pregnancy can serve as a flashpoint for parental retaliation or repercussions, igniting an abusive parent's anger and fueling his or her belief that the minor has low moral fiber, resulting in further and more aggressive maltreatment.  *Id.* ¶¶ 14–15.

According to the sworn declarations of Kathryn Smith, Indiana's "bypass coordinator," and Katherine Flood, a practicing attorney representing minors in Indiana consent-bypass proceedings, many of the young women whom they have assisted in attaining a bypass of Indiana's parental-consent requirements chose not to inform their parents of their pregnancy out of concern that they would face precisely this type of

obstruction or abuse if their parents discovered they were seeking an abortion. Smith Decl. ¶¶ 16–17; Flood Decl. ¶ 9.

Under SEA 404's proposed amendments, minors can no longer avail themselves of the judicial bypass procedures with the knowledge and comfort that their attempts would remain confidential, because, in every case where the juvenile court does not find that proceeding without notice is in the minor's best interests, it must order parental notice be issued before the abortion. Ind. Code § 16-34-2-4 (eff. July 1, 2017).

As borne out in Dr. Pinto's testimonial examples, fear of retaliatory domestic abuse may, in many cases, prompt pregnant minors to engage in hazardous self-help measures such as attempting to physically and/or chemically induce miscarriage or to entertain thoughts of suicide. *Id.* ¶ 16. Not surprisingly, the evidence also establishes that the threat that their parents may become aware of their pregnancy if they prove unsuccessful in court often suffices to deter many minors from even attempting to avail themselves of their constitutionally-protected right to seek a bypass of Indiana's parental-consent requirements. *See e.g.*, Dr. Pinto Decl. ¶ 28. Contrary to the State's contention, this deterrent effect is not ameliorated by the fact that under SEA 404's proposed parental-notification provision, a minor may obtain a bypass of notice if she can persuade the juvenile court that proceeding without notice is in her best interests. "It is hardly speculative to imagine that even some mature minors [or those for whom it would be in their best interests] will be deterred from going to court if they know that their parents

will be notified if their petitions are denied, because no minor can be certain that the court will rule in her favor." *Pearson*, 716 F.2d at 1141.

Indeed, as the Supreme Court recognized in *Casey*: "If anything in this field is certain, it is that victims of [domestic abuse] are extremely reluctant to report the abuse to the government." *Casey*, 505 U.S. at 893. As a result, many minors will find it difficult or impossible to make a full disclosure of their abuse in order to convince the court that proceeding without providing notice to their abuser is in their best interests. Research conducted in this area suggests that only about half of all abused minors ever disclose their abuse, and those who do, typically make their disclosure to a trusted adult with whom they have developed a rapport in a therapeutic environment. Dr. Pinto Decl. ¶ 20. Faced with the prospect of either disclosing her abuse to a relative stranger or being ordered to notify her abuser of her pregnancy and attempt to circumvent Indiana's consent requirements, it is no wonder that a minor might well be deterred from the process entirely.

Put simply, this deterrent effect of SEA 404's proposed parental-notification requirements unquestionably burdens the right of abortion-seeking minors in Indiana. What we must determine is whether that effect amounts to an "undue burden." *See Casey*, *supra.* In resolving that issue, we shall address the State's proffered justifications for the infringements imposed by SEA 404.

As previously recognized, the State's deep-rooted respect for the private realm of the family and its recognition of the guiding role of parents in the upbringing of their

children typically justify limitations on the freedoms of minors. However, "[c]onsent and involvement by parents in important decisions by minors long have been recognized as protective of their *immaturity*." *Bellotti*, 443 U.S. at 649 (emphasis added). Accordingly, PPINK maintains that the State has "no" interest whatsoever in promoting parental involvement in the case of *mature* minors, and, therefore, it cannot sustain an invasion of those minors' privacy. *See* Pls.' Br. at 20. We stop short of concurring in PPINK's position that the State's interest is zero, given that a parent's interest in, as well as responsibility for, the rearing and welfare of his or her unemancipated minor does not end at the abortion decision, nor is it completely extinguished by a judicial finding of maturity. These minors are, after all, unemancipated, meaning that for the remainder of their minority, they will likely continue to rely on their parents in each of the ways described above. Similarly, their parents will retain a coterminous interest in providing them with guidance, support, and stewardship. Nonetheless, these roles and responsibilities may be greatly diminished in the case of the minor who has shown that she is mature enough and well enough informed to make the abortion decision independently.

Accordingly, the State may not rely on the reserved rights of parents in the rearing of their children to justify its intrusion into the private life of the minor and the private domain of the family. The inescapable fact is that the government's intervention in this respect will have a far greater impact on the pregnant minor's bodily integrity than it will on the parents' authority. For this reason, the mature minor as the individual who bears

the full consequences of the ultimate decision is entitled to an opportunity to proceed

without state-mandated interference from her parents.  Because SEA 404 offers no such

opportunity, it places an unjustifiable burden on mature minors in violation of the

Fourteenth Amendment.[5]

### B.    Indiana Code § 16-34-2-4(a) and Indiana Code § 16-34-2-4(k)

PPINK next challenges the portions of SEA 404 that apply to cases in which the

minor has received parental consent to obtain an abortion.  Here, the amended statute

requires physicians, in addition to obtaining government-issued proof of identification

from a consenting parent, to procure "some evidence" of identity from the minor and her

consenting parent before the abortion is performed, which "may include identification or

other written documentation," capable of providing "an articulable basis for a reasonably

prudent person to believe" that the individual presenting as the minor's parent is, in fact,

the minor's parent.  Ind. Code § 16-34-2-4(a)(3) (eff. July 1, 2017).  The physician

performing the abortion would after reviewing such authenticating information be

required under SEA 404 to execute an affidavit attesting that a "reasonable person under

---

[5] We are not alone in reaching this conclusion. The Courts of Appeals for both the Fifth and Eighth Circuits addressed similar challenges in *Causeway Medical Suite v. Ieyoub*, 109 F.3d 1096 (5th Cir. 1997), *overruled on other grounds by Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001) and *Planned Parenthood, Sioux Falls Clinic v. Miller*, 63 F.3d 1452 (8th Cir. 1995), both drawing similar conclusions, to wit, that parental notification statutes must include a *Bellotti*-type bypass. *See also Nova Health Sys. v. Fogarty*, 2002 WL 32595281 (N.D. Okla. June 14, 2002) (reaching same conclusion). If enacted, however, Indiana would stand alone as the only state, of the seventeen requiring parental notification, to impose a notice requirement on unemancipated minors seeking an abortion without the opportunity to establish her maturity as a bypass of parental notice. *See* Pl.'s Br. at 21 n.13.

similar circumstances" would have relied on the documentation that was provided by the minor and her parent "as sufficient evidence of identity and relationship." Ind. Code § 16-34-2-4(k)(2) (eff. July 1, 2017). PPINK challenges these requirements on two grounds: first, the amendments are unconstitutionally vague on their face, and, second, they violate the Equal Protection Clause of the Fourteenth Amendment. We address first PPINK's vagueness challenge.

"The void for vagueness doctrine rests on the basic due process principle that a law is unconstitutional if its prohibitions are not clearly defined." *Hegwood v. City of Eau Claire*, 676 F.3d 600, 603 (7th Cir. 2012). The due process clause "does not demand 'perfect clarity and precise guidance,'" however. *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)). Rather, a statute is unconstitutionally vague only "if it fails to define the offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and it fails to establish standards to permit enforcement in a nonarbitrary, nondiscriminatory manner." *Fuller ex rel. Fuller v. Decatur Pub. Sch. Bd. of Educ. Sch. Dist. 61*, 251 F.3d 662, 666 (7th Cir. 2001). "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982).

For example, "[t]he Constitution tolerates a lesser degree of vagueness in enactments 'with criminal rather than civil penalties because the consequences of imprecision are more severe.'" *Karlin v. Foust*, 188 F.3d 446, 458 (7th Cir. 1999).

Likewise, vagueness concerns are heightened where a statute "threatens to inhibit the exercise of constitutionally protected rights." *Village of Hoffman Estates*, 455 U.S. at 499. The Seventh Circuit has also recognized that sanctions against a person's license are sufficiently severe to implicate void-for-vagueness concerns. *See United States ex rel. Fitzgerald v. Jordan*, 747 F.2d 1120, 1129–30 (7th Cir. 1984); *Baer v. City of Wauwatosa*, 716 F.2d 1117, 1123–24 (7th Cir. 1983). In a facial vagueness challenge, like the one before us, "the question is whether the statute is vague in all its operations." *Sherman ex rel. Sherman v. Koch*, 623 F.3d 501, 520 (7th Cir. 2010).

These specific statutory provisions in SEA 404 provide no meaningful guidance to a physician in determining what additional identification (separate from the government-issued form of identification that the consenting parent is already required to present under the statute) and/or other documentation would be sufficient to satisfy SEA 404's "some evidence" standard and provide "an articulable basis for a reasonably prudent person to believe" that the minor's parent is in fact who he or she purports to be. As such, SEA 404 fails to provide PPINK and its physicians "fair notice" as to the standard(s) to which their conduct must conform in order to avoid possible criminal prosecution and licensing sanctions. Physicians are left to guess as to the ways they are required "to conform [their] conduct to the law." *See City of Chicago v. Morales*, 527 U.S. 41, 58 (1999).

Both at oral argument and in its Response Brief, the State has conceded that the identification requirement is vague "at its margins," admitting that it is unclear what

"outer limits of permissible evidence" would be acceptable under the statute. *See* Defs.'
Resp. at 17–18. Despite these admissions, the State argues that the identification
requirement is not unconstitutionally vague because there are certain pieces of
evidence—such as a birth certificate with the minor's name and her parent's name, an
amended birth certificate or adoption decree for an adoptive parent, or some type of court
order memorializing a person's status as a legal guardian or custodian—that would
clearly satisfy the statutory requirements. Because PPINK's physicians are under no
obligation to test the limits of the statute, the State contends, they could simply choose to
accept only those "acceptable" forms of documentation before performing abortions on
minors with parental consent. The State further maintains that the availability of such
"safe harbors" defeats PPINK's vagueness challenge.

The State's rejoinder fails on all fronts. First, the only authority the State cites in
support of its "safe harbor" argument is the Supreme Court's decision in *Gentile v. State
Bar of Nevada*, 501 U.S. 1030 (1991). But *Gentile* does not support the proposition for
which it is cited by the State, to wit, that a statute cannot be unconstitutionally vague as
long as there is at least one clear way of complying with the statutory requirements that
individuals can choose to follow.[6] (The State conceded this weakness in its cited

---

[6] In *Gentile*, the Supreme Court held that a disciplinary rule governing pretrial publicity that
included a safe harbor provision permitting an attorney to discuss the "general nature of the …
defense … without elaboration" was void for vagueness. 501 U.S. at 1048. The Court found the
provision unconstitutionally vague insofar as "general" and "elaboration" are "both classic terms
of degree" that misled the plaintiff into believing that he could give a press conference following
the indictment of his client without fear of discipline. *Id.* at 1048–49. This holding clearly has
no relevance to the issues before us.

authority during oral argument.)  Moreover, as PPINK highlights in its briefing, if that were in fact an accurate statement of law, a number of prior cases that have held statutes void for vagueness would have been wrongly decided.  For example, in *Akron I*, the Supreme Court held unconstitutionally vague a requirement that fetal and embryonic remains be disposed of "in a humane and sanitary manner" following an abortion, 462 U.S. at 451–52, *overruled on other grounds by Casey*, 505 U.S. 833 (1992), despite the fact that certain means of disposal, including a burial or cremation, would undoubtedly be deemed "humane and sanitary" under any definition.  Similarly, in *Kolender v. Lawson*, 461 U.S. 352 (1983), the Supreme Court invalidated a statute requiring individuals encountered on the streets to provide police officers with "credible and reliable" identification when requested.  *Id.* at 359–60.  That statute was deemed unconstitutionally vague despite the fact that certain types of identification, such as government-issued photo identification, would most likely fall within anyone's definition of the term.

Additionally, even if the existence of a safe harbor were sufficient to insulate a statute from a vagueness challenge as the State contends, we are not persuaded that such a safe harbor exists here, given the imprecise and ambiguous statutory language at issue. It is not clear, for example, that PPINK and its physicians could ensure their compliance with the amended statute even if, as the State suggests, they required a birth certificate in all cases to prove the parental relationship before performing the abortion.  We can easily imagine a situation in which the parent's name listed on the birth certificate does not match the parent's identification, such as in cases of parental divorce or marriage.  The

statute provides no guidance regarding whether a birth certificate in that case would still provide "an articulable basis for a reasonably prudent person to believe" that the individual is the parent of the minor or whether a "reasonable person under the same circumstances" would still rely on the birth certificate to prove the parental relationship. Thus, even with documentation that the State contends "would plainly suffice" to meet the statute, the obvious vagueness problems associated with SEA 404's identification and affidavit requirements are not eliminated.

Moving beyond this limited example, it is clear that the statute provides no guidance regarding the contours of the identification and affidavit requirements. For example, a physician could not be sure after reading the statutory language whether matching surnames on a parent's and the minor's government-issued forms of identification would suffice to satisfy the statute. Even if matching last names on government-issued forms of identification would suffice in some circumstances, it is not clear whether under the statute that evidence would suffice where the surname is a common one, like "Jones" or "Smith," or in cases in which the appearance of the purported parent seems suspiciously youthful, such that, although sharing the same surname with the minor, the two might be only siblings. Nor is there guidance in the statute that would enable a physician to determine whether identification from a parent indicating a matching address with that of the minor, even if their last names were different, would be legally reliable in terms of the kind of evidence required under this statutory structure. The uncertainty is even greater when the documentation presented is

less official than government-issued forms of identification or when the minor lacks any form of identification in her name. There is no clarity in the statute as to what circumstances, for example, would justify a "reasonably prudent" person to accept a document such as a utility bill or school transcript as evidence of the parental relationship when more formal identification is not available.

We emphasize that this litany of problems is not simply an academic exercise. Rather, it illustrates the extent to which the imprecision embedded in the statutory scheme has serious real-world implications for PPINK and its physicians as well as for the minors who seek abortion services with their parent's consent. It is clear that the statutory provisions at issue qualify as penal statutes under prevailing law, given that any physician who performs an abortion on an unemancipated minor without obtaining proper identification and documentation from her parent and executing an affidavit is subject to criminal prosecution, *see* Ind. Code § 16-34-2-7(b), and the affidavit requirement subjects the physician to criminal prosecution for perjury, *see* Ind. Code § 35-44.1-2-1(a)(1). The Indiana State Department of Health may also revoke PPINK's license to operate as an abortion clinic based on any violation of these amendments, which, as noted above, the Seventh Circuit has recognized is a sufficiently severe sanction to implicate void-for-vagueness concerns.[7]

---

[7] We are not persuaded at this juncture that the *mens rea* requirements in the criminal statute enforcing the abortion requirements, (*see* Ind. Code § 16-34-2-7(b) (prohibiting the "perform[ance] of an abortion intentionally or knowingly in violation of [the statutes]")), and the perjury statute (*see* Indiana Code § 35-44.1-2-1(a) (providing that perjury requires a "false … affirmation, knowing the statement to be false or not believing it to be true")) stand as a

Because the statute leaves unspecified the parameters for compliance, prosecuting officials who are responsible for enforcement of the statute, including the Indiana State Department of Health, are afforded unfettered discretion to determine on a case-by-case basis whether the law has been violated. Given the highly controversial and often politicized nature of abortion rights, the danger that locally-elected prosecutors and other enforcement officials could use the imprecision and malleability of the standard to further their own views and agendas is especially problematic. Moreover, we find that PPINK has shown a likelihood that the vagueness of the identification and affidavit amendments "threatens to inhibit the exercise of constitutionally protected rights," *Colautti v. Franklin*, 439 U.S. 379, 391 (1979), as it is likely that physicians who are presented with documentation that they cannot be certain complies with SEA 404 (which, given the utter lack of guidance in the statute, will not be uncommon) will simply refuse to perform the abortion.[8] For these reasons, we hold that PPINK has shown a likelihood of succeeding

sufficient safeguard against the significant vagueness concerns raised by SEA 404's identification and affidavit requirements, particularly in this case where the requirements implicate constitutional rights. Unlike cases in which courts have found relevant the existence of a *mens rea* requirement, the *mens rea* requirement in the case at bar is not a part of the action proscribed. Therefore, while physicians may not be criminally convicted without the requisite *mens rea*, they are still required by law to act in compliance with the vague identification and affidavit amendments, neither of which contain a *mens rea* requirement. Accordingly, physicians' confusion regarding whether they are in compliance with the identification and affidavit requirements will still cause them to refrain from performing abortions when they cannot be sure whether they are in compliance with the amendments. In any event, there is no *mens rea* requirement constraining the ability of the Indiana State Department of Health to take action against an abortion provider's license upon a finding that the provider has allowed the commission of "any illegal act," (410 IAC 26-2-8), which the parties agree would include the failure of its physicians to obtain sufficient documentation of parental identity to satisfy the statute.

[8] The State conceded at oral argument that the safest option for physicians in questionable cases would be to decline to perform the abortion on the minor.

on its claim that the level of vagueness inherent in the identification and affidavit requirements of SEA 404 cannot pass constitutional muster.[9]

### C. Indiana Code § 16-34-2-4.2(c)

Finally, PPINK challenges the provision in SEA 404 that would prevent it from advising its clients of abortion options outside of Indiana. PPINK has indicated that its current practice is to regularly inform women, including minors, of their options for obtaining a legal abortion in Indiana as well as other states, particularly when other states have less onerous parental-consent requirements than does Indiana. However, the amended statute prohibits any person (other than the minor's parent or stepparent, grandparent or stepgrandparent, sibling or stepsibling) from "knowingly or intentionally aid[ing] or assist[ing] an unemancipated pregnant minor in obtaining an abortion without the consent required" under Indiana law. Ind. Code § 16-34-2-4.2(c) (eff. July 1, 2017). Both sides agree that this amendment would apply to PPINK and other medical providers and prohibit them from providing information to young women about abortion options outside the state of Indiana where parental-involvement requirements might be less expansive. PPINK argues that this is a content-based restriction on speech that cannot survive strict scrutiny and therefore violates the First Amendment.

---

[9] Because we find that PPINK is likely to succeed in showing that the identification and affidavit requirements are void for vagueness, we need not address PPINK's alternative argument that those amendments also violate the Equal Protection Clause.

The State rejoins that PPINK's dissemination of information about out-of-state abortion practices is "professional speech," and, as such, it is afforded lesser protection under the First Amendment. This argument is a nonstarter. Initially, we note that "[t]he Supreme Court has never formally endorsed the professional speech doctrine." *Serafine v. Branaman*, 810 F.3d 354, 359 (5th Cir. 2016). While the Seventh Circuit has not had occasion to directly address the issue, a number of other circuit courts have embraced the doctrine based on Justice White's concurrence in *Lowe v. SEC*, 472 U.S. 181, 230–33 (1985). *Id.* at 359 n.2 (collecting cases). Even if we were to assume for purposes of our analysis here that the professional speech doctrine is valid, it is inapposite to the facts before us. Indiana Code § 16-34-2-4.2(c) applies not just to physicians and other professionals, but prohibits private citizens as well from disseminating information about out-of-state abortion services with the intention of assisting a minor in obtaining an abortion without the consent required under Indiana law.

Moreover, even if the restriction applied only to medical providers, the professional speech doctrine is still not applicable. Although the Supreme Court has not set forth a specific test for what constitutes professional speech, lower courts, relying on Justice White's concurrence in *Lowe*, have opined that the professional speech doctrine is "properly confined to occupational-related speech made to individual clients." *Serafine*, 810 F.3d at 360; *see also Moore-King v. County of Chesterfield, Va.*, 708 F.3d 560, 569 (4th Cir. 2013) ("Professional speech analysis applies … where a speaker 'takes the affairs of a client personally in hand and purports to exercise judgment on behalf of the

client in the light of the client's individual needs and circumstances.'") (quoting *Accountant's Soc'y of Va. v. Bowman*, 860 F.2d 602, 604 (4th Cir. 1988)).  The doctrine does not apply if "the personal nexus between professional and client does not exist, and a speaker does not purport to be exercising judgment on behalf of any particular individual with whose circumstances he is directly acquainted."  *Serafine*, 810 F.3d at 359 (quoting *Lowe*, 472 U.S. at 232).

Here, the information PPINK and its physicians seek to convey to clients, to wit, factual information concerning consent requirements and abortion options in other states, is not tied to any medical procedure or professional advice that PPINK is providing to any particular individual patient.  Rather, the fact that other states may have more lenient parental consent and notification requirements for abortions is generic, non-medical information that does not involve professional judgment, is publicly available from a wide variety of sources, including the internet, and could be provided by anyone.  As PPINK argues, the mere fact that this non-medical information is being conveyed by medical providers does not transform it into professional speech.  Accordingly, as a content-based restriction on pure speech, Indiana Code § 16-34-2-4.2(c) is subject to strict scrutiny.  *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505–06 (1969).  The State has not disputed that this is a content-based restriction in any event.

To satisfy strict scrutiny, the State must show that the amended statute is narrowly tailored to serve a compelling state interest.  *Reed v. Town of Gilbert, Ariz.*, 135 S.Ct. 2218, 2226 (2015).  The State concedes that it has little interest in prohibiting adult

citizens from receiving factual information about the availability of abortion services that are legal in other states but may not be legal in Indiana. *See, e.g.*, *Bigelow v. Virginia*, 421 U.S. 809, 827–28 (1975) (holding that Virginia's "interest in shielding its citizens from information about activities outside Virginia's borders, activities that Virginia's police powers do not reach … was entitled to little, if any, weight"). However, the State contends that it has broader authority to regulate the dissemination of such information to minors as it has a compelling interest in safeguarding the parent-child relationship and protecting the physical and psychological well-being of minors, which interest does not end at the State's borders.

As we acknowledged above, these interests are undoubtedly compelling state interests. However, the State has failed to show how these interests are advanced by prohibiting private individuals, including medical providers, from disseminating information about lawful abortion practices in other states. The State has not articulated the specific psychological harm to minors that is caused by the dissemination of truthful information concerning lawful abortion options, particularly given that such information is widely available to the public. Nor has the State presented evidence that prohibiting the mere dissemination of accurate facts about abortion services that are lawfully available to minors outside of Indiana will correspondingly promote family integrity or facilitate family communication. "In the context of a First Amendment challenge under the narrowly tailored test, the government has the burden of showing that there is evidence supporting its proffered justification." *Weinberg v. City of Chi.*, 310 F.3d 1029,

1038 (7th Cir. 2002). The State has failed to satisfy its burden on the facts currently before us. Accordingly, PPINK has shown that it is likely to succeed in establishing that the amendment cannot survive strict scrutiny and therefore violates the First Amendment.

However, because there are various other valid applications of Indiana Code § 16-34-2-4.2(c) that do not involve impermissible restrictions on speech, we find that PPINK has demonstrated that it is likely to succeed only in establishing that this particular application of the amendment is unconstitutional. Accordingly, PPINK's entitlement to injunctive relief extends only that far. *See Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29 (2006) ("We prefer … to enjoin only the unconstitutional applications of a statute while leaving other applications in force, … or to sever its problematic portions while leaving the remainder intact.") (internal citations omitted).

## III.    Irreparable Harm/Inadequate Remedy at Law

Relying on the constitutional nature of its claims, PPINK argues that, absent injunctive relief, it will face irreparable harm for which there is no adequate remedy at law. The State does not contend that an adequate remedy at law exists, but argues that PPINK has failed to establish that the denial of injunctive relief in the case at bar will result in irreparable harm. However, the State's contention rests entirely on the conclusion that PPINK cannot show a likelihood of success on the merits. For the reasons detailed above, we disagree with the State's argument and find that, without injunctive relief, PPINK faces the denial of its constitutional rights, which is the quintessential irreparable harm.

It is well established that "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Campbell v. Miller*, 373 F.3d 834, 840 (7th Cir. 2004) (internal quotation marks and citation omitted); *see also Christian Legal Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006) (holding that likelihood of success on First Amendment violation presumed to constitute irreparable injuries).  Accordingly, we conclude that PPINK has made the necessary showing of irreparable harm.  Moreover, because the State does not contend that PPINK has an adequate remedy at law, coupled with the fact that demonstrating irreparable harm is "probably the most common method of demonstrating that there is no adequate legal remedy," *see Campbell*, 373 F.3d at 840 (citations omitted), we hold that PPINK has also established that no adequate remedy at law exists.

## IV.     Balance of Equities and the Public Interest

Because PPINK has succeeded in making the requisite threshold showing of a reasonable likelihood of success on the merits, no adequate remedy at law, and irreparable harm absent injunctive relief, we now "weigh[] the balance of harm to the parties if the injunction is granted or denied and also evaluate[] the effect of an injunction on the public interest."  *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 972 (7th Cir. 2012) (citations omitted), *cert. denied*.  The fact that we have found that PPINK has made a strong showing that it is likely to succeed on the merits of its claims puts a judicial thumb on the scale in ruling in its favor, given that

"[t]he more likely it is that [the moving party] will win its case on the merits, the less the balance of harms need weigh in its favor."  *Id.* (citation omitted).

The State argues that it has a strong interest in the implementation of statutes passed by the Indiana General Assembly, but our court has previously recognized that the public "do[es] not have an interest in the enforcement of a statute that … PPINK has shown likely violates the [Constitution]."  *Planned Parenthood of Ind. and Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 984 F. Supp. 2d 912, 931 (S.D. Ind. 2013).  According to the State, SEA 404 serves the public interest by furthering the State's interests "in protecting pregnant minors, encouraging parental involvement in their minor children's decision to have an abortion, and ultimately promoting fetal life."  Defs.' Resp. at 29.  We do not dispute that the State has such compelling interests, but as important as those interests may be, the State cannot advance those interests by enacting statutes that do not pass constitutional muster.  Given that PPINK has shown a likelihood of prevailing on the merits of its claims that the challenged provisions of SEA 404 place an undue burden on a mature minor's ability to obtain an abortion, impose unconstitutionally vague standards on physicians, and unlawfully burden speech, we hold that the balancing of harms and the public interest favor the issuance of a preliminary injunction.

## V.    Bond

Rule 65(c) of the Federal Rules of Civil Procedure provides that "[t]he court may issue a preliminary injunction … only if the movant gives security in an amount that the

court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  However, it is well established under Seventh Circuit law that "[u]nder appropriate circumstances bond may be excused, notwithstanding the literal language of Rule 65(c)."  *Wayne Chem. Inc. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 701 (7th Cir. 1977) (citations omitted).  Because the State is not facing any monetary injury as a result of the issuance of the preliminary injunction, we hold that no bond is required here.  *See Habitat Educ. Ctr. v. United States Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010) (recognizing there is no reason to require a bond in cases in which "the court is satisfied that there's no danger that the opposing party will incur any damages from the injunction").

## VI.     Conclusion

In striking the balances required by the Constitution, particularly in the area of abortion rights, it behooves all who have a hand in shaping governmental policy, whether in the judiciary, the legislature, or the executive branch, to keep two fundamental factual realities in mind:

First, these decisions always impose a direct and immediate impact on the lives of all our citizens, not just women, but perhaps most of all on the women who would seek to avail themselves of this highly significant procedure. The underlying principles that infuse these statutes and judicial opinions reach far beyond mere theory and legal debate to affect directly the behavior and freedom of individuals, families, communities, and society; and

Second, when it comes to our children, while parents or others entrusted with their care and wellbeing have the lawful and moral obligation always to act in their best interests, children are not bereft of separate identities, interests, and legal standing. Thus, it is both reasonable and just, as the law recognizes, that the closer a minor child is in age, maturity, and other circumstances to reaching her majority and the further along she has moved on the continuum towards self-determination, the more expansive are her legal entitlements.

For the reasons detailed above, Plaintiff's Motion for Preliminary Injunction is GRANTED. Defendants (with the exception of the Judge of the Marion Superior Court, Juvenile Division) are hereby PRELIMINARILY ENJOINED until further order of this Court from enforcing the following sections of Senate Enrolled Act 404:

- the bypass procedure set out in Indiana Code § 16-34-2-4 (eff. July 1, 2017);

- the new identification and affidavit requirements contained in Indiana Code § 16-34-2-4(a) and (k) (eff. July 1, 2017); and

- Indiana Code § 16-34-2-4.2(c), only insofar as it would prohibit persons, including PPINK and its physicians, from disseminating to minors information regarding legal abortion practices in states other than Indiana.

Defendants are hereby further ordered to inform forthwith all the affected Indiana state governmental entities of this injunction.

**IT IS SO ORDERED.**

Date: _____6/28/2017_____

_Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Gavin Minor Rose
ACLU OF INDIANA
grose@aclu-in.org

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Jan P. Mensz
ACLU OF INDIANA
jmensz@aclu-in.org

Andrew  Beck
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
abeck@aclu.org

Thomas M. Fisher
OFFICE OF THE ATTORNEY GENERAL
tom.fisher@atg.in.gov

Matthew Richard Elliott
OFFICE OF THE INDIANA ATTORNEY GENERAL
Matthew.Elliott@atg.in.gov

Jennifer  Sandman
PLANNED PARENTHOOD FEDERATION OF AMERICA
jennifer.sandman@ppfa.org

Melissa A. Cohen
PLANNED PARENTHOOD FEDERATION OF AMERICA
melissa.cohen@ppfa.org